# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------------------------------x
JAMES DeANGELO,                        :
                                       :
                Plaintiff,             :      CIVIL ACTION NO.
                                       :
v.                                     :      3:12-CV-00520 (CSH)
                                       :
YELLOWBOOK, INC.,                      :
                                       :
                Defendant.             :
------------------------------------------------------x      August 30, 2013
```

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND

    A.    Jim DeAngelo, a Successful Salesman, Is Diagnosed with Cancer.

    B.    Mr. DeAngelo's Supervisors Fail to Advise Mr. DeAngelo of his FMLA Rights.

    C.    Yellowbook Cracks Down on Mr. DeAngelo's Decreased Productivity While Undergoing Cancer Treatment Instead of Initiating an Interactive Dialogue Regarding his Obvious Disability.

    D.    Yellowbook Creates a Pressure Cooker Environment for Mr. DeAngelo, Compromising his Recovery and Prompting him to Seek FMLA Leave.

    E.    Yellowbook Discriminatorily Terminates Mr. DeAngelo for a Reason that is Unworthy of Belief.

        1.    Copy Sheets Are Internal Yellowbook Forms Of Little Import.

        2.    Throughout Mr. DeAngelo's Tenure, Salespeople and Managers Alike Frequently Signed Customer Copy Sheets.

        3.    Yellowbook Cannot Identify A Single Employee Whom It Has Terminated for Signing Customer Copy Sheets.

        4.    One Month After It Terminated Mr. DeAngelo, Yellowbook Announced that It Would No Longer Permit its Sales Force to Sign Copy Sheets.

    F.    Prior to Terminating Mr. DeAngelo, Messrs. Benjamin and Cianciullo Knew that he Planned on Taking FMLA Leave.

II.    PROCEDURAL BACKGROUND

III.    LEGAL STANDARD

IV.    ARGUMENT

    A.    Summary Judgment on Mr. DeAngelo's CFEPA Claim Should Be Denied.

        1.    Mr. DeAngelo Was Disabled Under the CFEPA.

        2.    Mr. DeAngelo Can Prove the Causation Element of his CFEPA Claim.

            a.    The CFEPA Does Not Demand "But-For" Causation. Even If "But-for" Causation Applies Under the CFEPA, It Works Only a Minor Change.

            b.    The Evidence Here Amply Supports But-For Causation.

    B.    Summary Judgment Should Be Denied on Mr. DeAngelo's ADA Claim

C.    Summary Judgment Should Be Denied on Mr. DeAngelo's FMLA Interference and Retaliation Claims.

    1.    The Evidence Requires that Summary Judgment on Mr. DeAngelo's FMLA Interference Claim Be Denied, as Yellowbook Cannot Carry its Burden of Proving that it would have Terminated Mr. DeAngelo Regardless of his FMLA Request.

    2.    The Evidence Requires that Summary Judgment on Mr. DeAngelo's FMLA Retaliation Claim be Denied.

        a.    The Decision-Makers Knew About Mr. DeAngelo's Request.

        b.    The FMLA Does Not Require "But-For" Causation.

        c.    Mr. DeAngelo's FMLA Retaliation Claim Survives Under Any Standard of Proof.

V.    CONCLUSION

Yellowbook, Inc. terminated James ("Jim") DeAngelo after learning that he was receiving treatment for cancer and had requested leave under the federal Family and Medical Leave Act.  The justification the Company provided was that Mr. DeAngelo violated Company policy by signing his own name to internal Company forms called "copy sheets."  Yet Yellowbook had never before terminated any employee for signing copy sheets.  Indeed, for years, Yellowbook employees and managers alike — including Mr. DeAngelo's direct supervisor — had regularly signed copy sheets without any discipline whatsoever.  The fact that Jim DeAngelo was the only person the Company had ever fired for engaging in this widespread and accepted practice would easily allow a jury to conclude that it was his disability and his FMLA request — and not any purported policy violation — that led Yellowbook to terminate his employment.

## I.    FACTUAL BACKGROUND

### A.    Jim DeAngelo, a Successful Salesman, Is Diagnosed with Cancer.

Over the course of his five years as a sales representative at Yellowbook, Jim DeAngelo proved himself to be a top performer.  He received numerous awards, including the President's Club Award, given to the company's top sellers, and the Spirit of Excellence Award, a "peer-based award where people in [Mr. DeAngelo's] office vote for the person who . . . is particularly helpful and who personifies the kind of person that people like to work with."  That award is bestowed once a year upon one employee out of the approximately 36 employees in Mr. DeAngelo's office.  (PJR 1 at 73-74 (DeAngelo); PJR 2 at 120-21 (Cianciullo); DeAngelo Tr. at 27-28.)[1]

---

[1]  Transcripts of the hearing on Mr. DeAngelo's motion for a prejudgment remedy are abbreviated as "PJR 1" for the first day and "PJR 2" for the second day, with a parenthetical identifying the hearing witness.  Transcripts of deposition testimony are abbreviated as "[Last

For the January to June 2010 sales period, Mr. DeAngelo was rated #1 in his office, having met approximately 127% of his objective, and he was promoted from sales representative to Account Executive.  (PJR 1 at 76, 223 (DeAngelo).)  Shortly thereafter, however, Mr. DeAngelo began suffering from fatigue, weight loss, and a constellation of other troubling health symptoms.  (*Id.* at 77-78, 223.)

In October 2010, Mr. DeAngelo was diagnosed with lymphoma.  (*Id.* at 78.)  He promptly notified management at Yellowbook — his supervisor, Joe Cianciullo, and Mr. Cianciullo's manager, Odded Benjamin — of his diagnosis and of his need for sporadic time off to accommodate chemotherapy, doctors' appointments, and blood transfusions.  (*Id.* at 78-79.)  In the ensuing months, Mr. DeAngelo kept Messrs. Cianciullo and Benjamin apprised of his appointments and treatments.  (PJR 2 at 28-29, 121 (Cianciullo).)

Mr. DeAngelo's grave illness was painfully apparent to all who knew him.  He lost approximately 30 pounds, his skin turned gray, and the chemotherapy treatments left him weak, lethargic, and short of breath.  (PJR 1 at 77, 80 (DeAngelo); *see also* Zamora Tr. at 41 (noting that Mr. DeAngelo had "lost a lot of weight and you could see it in his face," and that, in contrast to his usual high-energy self, Mr. DeAngelo was weak and tired).)

**B.**     **Mr. DeAngelo's Supervisors Fail to Advise Mr. DeAngelo of his FMLA Rights.**

On November 12, 2010, Mr. DeAngelo sent an e-mail to Messrs. Benjamin and Cianciullo regarding his prognosis.  He told them that he was taken to the emergency room following a cancer treatment and that, as a result, he needed to receive treatment three times per month, rather than just the  once per month that he had originally anticipated.  He also explained

---

name of witness] Tr. at [page number]."  Documentary exhibits are abbreviated as "Exh. _, [brief description]."  All cited transcripts and documentary exhibits are attached to the Declaration of Nina T. Pirrotti, filed herewith, at the Exhibit letter indicated therein.

that he had to have weekly blood transfusions because his "blood cell count is half of what it

needs to be."  He went on to advise his supervisors that: "I am trying to balance all this out best I

can but sometimes [my doctors]  just throw a [sic] appointment at me without notice

and theres [sic] times I have said I cant [sic] due to my work."  (Exh. E, Email from J. DeAngelo

(Nov. 12, 2010).)  Notwithstanding their knowledge that Mr. DeAngelo's treatment was

intensifying and that he had actually turned down medical treatments because of his work,

neither Mr. Cianciullo nor Mr. Benjamin advised Mr. DeAngelo of his rights under the FMLA.

(PJR 1 at 106 (DeAngelo); PJR 2 at 123 (Cianciullo).)

C.     **Yellowbook Cracks Down on Mr. DeAngelo's Decreased Productivity While
       Undergoing Cancer Treatment Instead of Initiating an Interactive Dialogue
       Regarding his Obvious Disability.**

While Yellowbook was initially supportive of Mr. DeAngelo's need for medical

treatment, the support was short-lived:

> The fact is, at the early part of my sickness, Odded [Benjamin] and Joe
> [Cianciullo] were very behind me. . . . But as time went on, that deteriorated
> drastically.  To the point of -- forgetting really what kind of rep I was like in
> previous years, you know.  Always like, you know, one of the top reps in the
> office, always the guy that would help out other reps. . . . And as I got sick and
> they saw I wasn't able to keep up with what I used to, it's almost like, I'll use the
> expression "kicking me to the curb" type of thing.  And that's the feeling I got as
> time went on.

(DeAngelo Tr. at 257; *see also* PJR 1 at 224 (DeAngelo) (describing how Yellowbook's attitude

changed "for the worse," like an "out of control train").)

As Mr. DeAngelo's cancer treatment progressed and his sales numbers began to falter,

neither Mr. Cianciullo nor Mr. Benjamin engaged Mr. DeAngelo in an interactive dialogue to

attempt to accommodate his disease.  (PJR 1 at 81 (DeAngelo).)  To the contrary, throughout the

fourth quarter of 2010, they put increasing pressure on Mr. DeAngelo to make new sales even

though they knew full well that, during that same quarter, Mr. DeAngelo was attending doctors'

3

appointments, undergoing chemotherapy treatments, and receiving blood transfusions.  (*Id.* at 81-83 (DeAngelo); PJR 2 at 26-28 (Cianciullo).)  On top of all of that, he had to battle a winter filled with blizzards that were historic, both in terms of their number and their intensity.  (Exh. F, Media coverage (Dec. 2010); PJR 2 at 128 (Cianciullo).)

Although his supervisors did reduce his fourth-quarter quota from twelve sales to eight,[2] given his health and the unusual weather conditions, that number was still grossly unrealistic. (PJR 1 at 82-84 (DeAngelo).)  Mr. DeAngelo's approach to obtaining new business focused in significant part on going door to door.  (DeAngelo Tr. at 93; Exh. G, DeAngelo Aff. ¶ 1.)  While this would have been challenging to any sales representative having to contend with snow drifts, closed businesses, and difficulty in finding parking close to the targeted businesses that remained open, it was especially daunting for Mr. DeAngelo, who was tired and weak from his cancer treatment.  (DeAngelo Tr. at 78-79.)

Mr. Cianciullo was unmoved by the unique challenges facing Mr. DeAngelo that quarter. On December 29, 2010, just two days after the historic blizzard, while Mr. DeAngelo was undergoing blood transfusions and chemotherapy with Mr. Cianciullo's full knowledge (PJR 1 at 89 (DeAngelo); Cianciullo Tr. at 206-07), Mr. Cianciullo sent Mr. DeAngelo a text message: "Jim…8 new sales for the quarter is no longer optional it is a must…do whatever it takes to get 2 more new…missing the 8 will not be tolerated."   (Exh. I, Text messages (emphasis added).)  He followed up with another text that same day, in which he bore down harder: "Any sales yet?... you are running out of time…how many doors have you hit in your zone this week?"  (*Id.* (emphasis added).)  When Mr. DeAngelo responded that "Monday was a blizzard and yesterday

---

[2]  Yellowbook claims that it is Mr. DeAngelo who came up with this reduced number. (Cianciullo Tr. at 175.)  Mr. DeAngelo testified that his managers proposed it.  (PJR 1 at 81 (DeAngelo); DeAngelo Tr. at 88.)

I was at the Doctors," Mr. Cianciullo's only response was: "<u>Excuses Jim</u> where are all the sales that you have promised week after week[?]" (*Id.* (emphasis added); *see also* Cianciullo Tr. at 177.) Mr. Cianciullo sent these text messages to Mr. DeAngelo during the week between Christmas and New Year's, which even he admitted was known to be the "slowest sales week of the year." (PJR 2 at 123 (Cianciullo); Cianciullo Tr. at 78; *see also* Zamora Tr. at 42.)

**D.      Yellowbook Creates a Pressure Cooker Environment for Mr. DeAngelo, Compromising his Recovery and Prompting him to Seek FMLA Leave.**

Mr. Cianciullo generally required his sales representatives to sell <u>twelve</u> new businesses <u>per quarter</u>. On January 5, 2011, however, Mr. Cianciullo informed Mr. DeAngelo that he would be required to sell <u>seven</u> new businesses <u>in the month of January alone</u>. (*See* Exh. J, E-mail from Joe Cianciullo (Jan. 5, 2011), at 1; PJR 2 at 130 (Cianciullo); DeAngelo Tr. at 254.) Mr. Cianciullo admitted that this new requirement — imposed only on Mr. DeAngelo — constituted almost double what he required of every other member of his sales team. (PJR 2 at 135 (Cianciullo).)

The new requirement came with a significant penalty. Until he had sold seven new businesses, Mr. Cianciullo said, Mr. DeAngelo could not sell to his existing accounts. (*See* Exh. J, Email from J. Cianciullo (Jan. 5, 2011), at 1; PJR 2 at 130 (Cianciullo); DeAngelo Tr. at 254.) Notably, prior to his cancer diagnosis, Mr. DeAngelo had occasionally failed to reach his quota for new sales. Yet <u>never</u> before had Mr. Cianciullo prohibited him from selling to his existing accounts. (PJR 2 at 131 (Cianciullo).)

The loss of his established accounts was a devastating financial blow to Mr. DeAngelo since the revenue from those accounts constituted the vast majority of his income. (DeAngelo Tr. at 62-63, 255; PJR 1 at 95-96 (DeAngelo).) Mr. DeAngelo's reliance on his so-called "revenue" accounts was not unusual. Ms. Zamora confirmed that, if she were deprived of the

5

ability to sell to her existing customer base, it would impact her financial picture "pretty significantly," and she would be concerned whether she could pay her bills.  (Zamora Tr. at 27.)  Ms. Zamora also explained that, even if the goal had been to sell seven new businesses in six weeks rather than four, and even if there were not additional blizzards during this timeframe, Mr. Cianciullo's mandate of seven sales would still have been unrealistic.  (*Id.* at 46; Exh. K, Media coverage (Jan. 2011).)

On January 13, 2011, Mr. DeAngelo's supervisors gave him a verbal warning based on his failure to meet his third and fourth quarter quota.[3]   Mr. Cianciullo admitted that he knew that, during both of those quarters, Mr. DeAngelo was "undergoing both symptoms of cancer and cancer treatment."  (PJR 2 at 136 (Cianciullo).)

On January 22, when it was clear that Mr. DeAngelo would not be able to sell to seven new businesses by the end of January, Yellowbook took its pressure on Mr. DeAngelo to a whole new level.  Mr. Benjamin informed Mr. DeAngelo that, if he did not sell to seven new businesses by mid-February, Yellowbook would actually redistribute some of his existing accounts to other salespeople.[4]  (PJR 2 at 131 (Cianciullo); Exh. M, Emails between O. Benjamin and J. DeAngelo (Jan. 22, 2011), at 1; *see also* DeAngelo Tr. at 255.)  Mr. Cianciullo admitted that never before during his career at Yellowbook had he ever imposed such a sanction on one of his team

---

[3]  Although the warning was designated as "verbal," it was memorialized in a written document. (Exh. L, Written Warning (Jan. 13, 2011).)  While it mistakenly referred to the "first and fourth" quarters, Yellowbook concedes that the warning actually concerned the third and fourth quarters. (Def. Rule 56(a)(1) Statement ¶ 59.)

[4]  Seventy percent or more of Mr. DeAngelo's income came from these accounts, which he had cultivated over many years. (PJR 1 at 95 (DeAngelo).)  He described how valuable these clients were to him:  "I had tremendous relationships with my established accounts . . . These people trusted me, they knew me.  They knew my wife's name.  I knew their dog's name.  We built up a relationship that was above and beyond advertising."  When asked what role trust played in consummating sales, Mr. DeAngelo responded: "Oh, there's times I would walk in the door with some of my existing accounts and they would say to me, 'Okay, Jim, what do we have to do?' There would be no questions asked."  (*Id.* at 94-95 (DeAngelo).)

members. Jim DeAngelo was the first.[5]  (PJR 2 at 132 (Cianciullo); Cianciullo Tr. at 85-86.)

 Mr. Cianciullo's actions in January 2011 were designed to set up Mr. DeAngelo to fail. He acknowledged that, while Mr. DeAngelo was "exceptional" at selling to his existing accounts (PJR 2 at 132 (Cianciullo)), he knew full well that Mr. DeAngelo's weakness was selling to new accounts.  He also admitted that selling to new accounts required far more work than selling to existing accounts.  (PJR 2 at 58-59 (Cianciullo); *see also* PJR 1 at 232(DeAngelo); Cianciullo Tr. at 42-43.)  Indeed, Mr. Cianciullo's "rule of thumb" for new businesses was "20 doors, 3 appointments, 1 sale."  (PJR 2 at 134 (Cianciullo).)  Given Mr. Cianciullo's own "rule of thumb," his requirement that Mr. DeAngelo sell seven new businesses in a single month — rather than the roughly three per month required of everyone else — meant that Mr. DeAngelo would have to knock on 140 doors in a single month, a month in which he was still undergoing cancer treatment and contending with historic blizzards.

 In an attempt to blunt the financial impact of his supervisor's edict, Mr. DeAngelo asked Messrs. Benjamin and Cianciullo if he could sell to his existing accounts just one day a week. (Exh. M.)  This plan would have benefitted not only Mr. DeAngelo's bottom line but Yellowbook's as well.  Nonetheless, Mr. Benjamin refused.  (*Id.*; PJR 1 at 97 (DeAngelo).)

 The confluence of his cancer treatments, the pressure to score an unrealistic number of new accounts, his sharply reduced income from Yellowbook's refusal to allow him to sell to his established accounts, and the fear that those accounts would be permanently taken away from him, crippling him financially, placed Mr. DeAngelo under extreme stress.  When he conferred with his medical provider about his situation, she expressed concern that, even though his health

---

[5]  In fact, the most discipline Mr. Cianciullo had ever imposed regarding existing accounts was to require a sales representative to suspend selling to those accounts for a period of time, with the understanding that those accounts would remain that sales representative's business and would not be reallocated.  (Cianciullo Tr. at 85-87.)

had been improving, the stress he was experiencing in the workplace could inhibit his full

recovery.  (Exh. N, CHRO Compl., ¶¶ 13-14.)    As Mr. DeAngelo explained:

> [Y]ou don't need any more issues to deal with.  Cancer is big enough.  And when
> the job that you're depending on to pay your mortgage and pay your bills and to
> be the breadwinner in your house and they start putting pressure on you and
> telling you, you better sell or else, you better sell or else, you better sell or else . . .
> it puts a lot of added stress on my healing process of my cancer . . . .

(PJR 1 at 139 (DeAngelo).)

In or about late January or early February 2011, Mr. DeAngelo contacted Yellowbook's

Human Resources department to discuss the possibility of taking FMLA leave.  (Exh. O, Email

from B. Carson (Feb. 16, 2011); PJR 1 at 109 (DeAngelo).)  After conferring with his doctor, he

decided to request a period of continuous FMLA leave, and on February 22, 2011, he faxed a

letter from his medical provider to Yellowbook's Human Resources department in support of

that request.  (Exh. P, Fax from J. DeAngelo (Feb. 22, 2011).)

## E.    <u>Yellowbook Discriminatorily Terminates Mr. DeAngelo for a Reason that is Unworthy of Belief.</u>

Less than one month after Mr. DeAngelo first approached Yellowbook about taking

FMLA leave and the same day on which he submitted the letter supporting that leave,

Yellowbook terminated him.[6]  Messrs. Benjamin and Cianciullo justified the termination by

claiming that they had "discovered" that Mr. DeAngelo had "forged" some Yellowbook copy

sheets <u>by signing his own name to them</u>, instead of the customer's name.  Yet prior to deciding

to terminate Mr. DeAngelo, Yellowbook's managers had no idea whether Mr. DeAngelo had

permission from the customers at issue to sign the copy sheets, nor did they even bother to

determine whether or not the copy sheets embodied what the customer wanted.  (PJR 2 at 155

---

[6]  Mr. DeAngelo faxed that letter at 11:10 a.m.  (Exh. P.)  Mr. Cianciullo testified that
Yellowbook may have terminated Mr. DeAngelo in the early afternoon hours that same day.
(Cianciullo Tr. at 152.)

(Cianciullo).)  The evidence shows that they made no such efforts because Yellowbook knew all

along exactly what Mr. DeAngelo — and virtually all of Yellowbook's other employees and

managers —were doing.  Yellowbook was, in sum, "shocked, shocked to find that [copy sheets

signed by sales representatives] is going on in here."[7]

### 1.    Copy Sheets Are Internal Yellowbook Forms Of Little Import.

Copy sheets are internal Yellowbook forms that sales representatives use to draft the

initial advertising copy based upon input from their customers.  (PJR 1 at 124 (DeAngelo).)

They are essentially a "starting point" for creating a customer's ad.  (*Id.*; Brereton Tr. at 42-43.)

After the initial copy sheet is executed, customers still have numerous opportunities to change

the content of their advertisement.  Accordingly, the initial copy sheet is virtually meaningless.

Indeed, during Mr. DeAngelo's tenure, Yellowbook allowed its customers to call their sales

representatives or even the art department directly to instruct a staff member to make changes to

the copy sheet.  The art department would then implement those changes without requiring any

additional customer signature.  (PJR 2 at 137 (Cianciullo); PJR 1 at 126-27 (DeAngelo).)  More

often than not, customers took advantage of the opportunity to change the copy.  (Brereton Tr. at

93; Montgomery Tr. at 39-42.)[8]

The copy sheet that matters — the "final proof" — is sent by the art department <u>directly</u>

---

[7]  The full dialogue from the *Oscar*-winning screenplay:

> Rick: How can you close me up? On what grounds?
> Renault: I'm shocked, shocked to find that gambling is going on in here.
> Employee of Rick's: *[hands Renault money]* Your winnings, sir.
> Renault: Oh, thank you, very much. Everybody out at once!

*Casablanca* (1942).

[8]  Following Mr. DeAngelo's termination, this practice changed.  Now, if the customer wants the art department to make any changes to the ad, the customer must provide an additional signature approving those changes.  (Zamora Tr. at 51.)

to the customer for the customer's approval.  Once the customer receives the final proof, he or

she has yet another opportunity to make changes to the ad.  So if the initial copy sheet that the

sales representative signed did not reflect exactly what the customer wanted, the customer could

make any changes he or she wished to the final version, and the art department would make

those changes before processing the ad.  (PJR 1 at 127-29 (DeAngelo); PJR 2 at 137-38

(Cianciullo); Zamora Tr. at 53-54; Cianciullo Tr. at 108.)  None of the four copy sheets that

Yellowbook used to justify Mr. DeAngelo's termination were final proofs.  To the contrary, all

of them were copy sheets that would have been sent to the art department and could have been

further revised without any additional customer signature.  (PJR 2 at 140 (Cianciullo).)[9]

### 2.    Throughout Mr. DeAngelo's Tenure, Salespeople and Managers Alike Frequently Signed Customer Copy Sheets.

Yellowbook claims that Mr. DeAngelo violated an established Company policy.  He did

not.  If Yellowbook actually had a policy requiring termination for signing customer copy sheets,

then it would have had to terminate most of its sales force and many members of its management

team.  That is because the practice of signing customer copy sheets was widespread.  According

to former Yellowbook salesman Mike Brereton, "[e]verybody does it."  (Brereton Tr. at 36; id. at

49 ("I've seen everyone sign them.  I had no idea it was the policy [that such actions were

prohibited].")  Mr. Brereton testified that he himself had signed them on many occasions.  (Id. at

116.)  Former supervisor Nancy Montgomery agreed: "when [Mr. DeAngelo] was there . . . , we

---

[9]  A sales representative has no incentive to sign a copy sheet that does not reflect what his customer's desires.  If he does, the customer can demand a refund, and he will forfeit his commission.  (PJR 1 at 129 (DeAngelo).  And since Mr. DeAngelo had a "great" relationship "of trust and confidence" with his long-time customers, as Mr. Cianciullo admits (PJR 2 at 132 (Cianciullo)), a reasonable jury could conclude that the only way he could have maintained that trust and confidence is if, when he signed those copy sheets, he ensured that they reflected exactly what the customer wanted.

were doing it, where you'd put the customer's name and you'd put your initials next to it."
(Montgomery Tr. at 42-43; *see also id.* at 50-51; Siegel Tr. at 39-41.)

Nor was Ms. Montgomery the only member of management who engaged in this practice.   According to Ms. Zamora, not only was it a common practice for sales representatives to sign copy sheets, but she personally observed Yellowbook managers — including Mr. DeAngelo's supervisor, Joe Cianciullo — sign copy sheets.  Indeed, she testified to the nonchalant manner in which supervisors Nancy Montgomery (who at one point supervised Mr. DeAngelo) and Mr. Cianciullo committed this purportedly unauthorized activity:

> A.    A rep came into the office and handed [Ms. Montgomery] a contract with the copy sheet.  She signed off on the copy sheet.  So the rep could turn in the paperwork. . . . [T]he rep didn't say "sign this."  The rep said "I can't turn this in until I get a copy sheet signed."
>
> . . .
>
> Q.    Okay.  And what did [Ms. Montgomery] say?
>
> A.    She said "I'll take care of it."  And she signed it.

(Zamora Tr. at 27.)

> Q.    [T]ell me the circumstances under which you came to learn that Mr. [Michael] Brereton had asked Joe Cianciullo to sign a copy sheet?
>
> . . .
>
> A.    I was sitting in Joe's office.  Mike came in with his paperwork.  He said he was missing a copy sheet or missing paperwork.  And Joe signed off on the copy sheet for him.
>
> . . .
>
> Q.    Did you notice Mr. Cianciullo hesitate in any way before he picked up his copy sheet and signed it for Mr. Brereton?
>
> A.    No.

> Q.      Did he say anything like "I shouldn't be doing this"?
>
> A.      No.

(*Id.* at 32-34.)

Like Ms. Zamora, Mr. Brereton also observed Mr. Cianciullo sign copy sheets.  In fact, he testified that Mr. Cianciullo signed the customer's name to copy sheets on several occasions: "[Mr. Cianciullo would] say, 'Your copy sheet is not signed.'  I'd say, 'Oh, let me see that.'  He'd say, 'Nah, just turn your head.'"  And then the sheet would miraculously be signed. (Brereton Tr. at 51-56.)

Two different witnesses testified that Yellowbook's "policy" regarding signing customer copy sheets was reminiscent of the military's former "Don't Ask, Don't Tell" policy: salespeople and managers alike were permitted to regularly engage in such conduct; they just were not supposed to talk about it.  (Montgomery Tr. at 95; Brereton Tr. at 83, 106-07.) According to Nancy Montgomery, a Yellowbook sales manager for more than seven years, while the "the letter of the law" was that "any sort of change in a copy sheet need[ed] to be re-signed [by the customer]" (Montgomery Tr., at 9, 41), that was not the reality:

> Q.      [D]oes Yellowbook permit its employees to sign copy sheets on behalf of customers?
>
> A.      Used to, yes.
>
> Q.      When was that?
>
> A.      Back in the day when Jim [DeAngelo] was there.

(Montgomery Tr. at 42 (emphasis added).)  She further explained that "it was just like an understanding" that salespeople and their managers could sign copy sheets because it made "practical sense."  (*Id.* at 43.)  In this manner, whenever a customer required a change (which they did more often than not (*id.* at 39; Brereton Tr. at 93)), "instead of having to go back and get

another signature," the sales person could simply send the ad directly for processing

(Montgomery Tr. at 43).[10]

### 3.    Yellowbook Cannot Identify A Single Employee Whom It Has Terminated for Signing Customer Copy Sheets.

Yellowbook claims that it had a policy requiring termination for employees who signed

customer copy sheets.  (Def. Mem. at 3-4.)  Its corporate representative, however, could not

point to a single individual in the country — other than Jim DeAngelo himself — whom the

Company had ever terminated for signing customer copy sheets.[11]  In fact, when she was asked

how she could justify her assertion that Yellowbook had a uniform policy requiring termination

for this practice, the corporate representative could point only to Mr. DeAngelo's individual

case[12].  (Corcoran Tr. at 158-59.)  Mr. Cianciullo likewise testified that he was not aware of a

single instance prior to Mr. DeAngelo where Yellowbook had terminated an employee just for

signing copy sheets.[13]  (PJR 2 at 141 (Cianciullo); Cianciullo Tr. at 127-28; *see also* Zamora Tr.

---

[10]  In contrast to customer contracts, Yellowbook's copy sheets have no independent legal significance.  (*See* Montgomery Tr. at 28-30; Corcoran Tr. at 55 (agreeing that copy sheet does not "create any legal obligation between Yellowbook and the customer").)  Moreover, while Yellowbook now claims that the "falsification" of all documents was equally serious (Corcoran Tr. at 178), its employees all recognized the critical differences between contracts and copy sheets (Montgomery Tr. at 28; Brereton Tr. at 46).

[11]  Although Yellowbook requested, and counsel for Mr. DeAngelo agreed, to limit the Rule 30(b)(6) deposition topic regarding comparable discipline to Yellowbook's Milford, Connecticut office from 2008-11, the Rule 30(b)(6) witness was asked in her personal capacity — as Human Resources director for the entire United States (Corcoran Tr. at 7) — whether she could name any person other than Mr. DeAngelo who had been terminated for signing copy sheets.  She could not.  (*Id.* at 158-59)  Nor could her experienced colleagues.  (*Id.* at 250-51.)

[12]  Furthermore, the document that Yellowbook claims supports a policy mandating termination for signing customer copy sheets actually states that Yellowbook "may" impose discipline "up to and including termination."  No document mandated termination.  (Exh. U, Memo. (Feb. 22, 2008).)

[13]  Yellowbook did terminate sales representatives for signing customers' names to contracts, but there is a world of difference, of course, between that illegal practice and merely signing an internal document used only to generate a proposed ad for a customer.  *See* note 10 *supra*.

at 36, 64.)  Indeed, when Mr. DeAngelo informed the manager who interviewed him at

Cablevision (where he was subsequently hired) that Yellowbook had terminated him for signing

copy sheets, the manager — a former Yellowbook employee — stated he had never heard of

anyone who had been terminated for that practice.  (DeAngelo Tr. at 260-61.)

### 4. One Month After It Terminated Mr. DeAngelo, Yellowbook Announced that It Would No Longer Permit its Sales Force to Sign Copy Sheets.

It was only _after_ Yellowbook terminated Jim DeAngelo that the Company held a meeting

for the entire Milford office in which it discussed that the signing of copy sheets would no longer

be allowed.  (Montgomery Tr. at 45, 56; _see also id._ at 43 ("[I]t was filtered down to all of us . . .

that you can _no longer_ put the person's name, and . . . put your initials next to it.  That you just

can't do that _any longer_." (emphases added)); PJR 2 at 148 (Cianciullo) (admitting that, one

month after Mr. DeAngelo's termination, management held a meeting in which it stated that

"even signing copy sheets would not be tolerated").)

Yet it would have been nonsensical for Yellowbook to hold such a meeting if, as it

maintains, it had actually had a consistent policy during Mr. DeAngelo's tenure of prohibiting

salespeople from signing customer copy sheets.  (_See_ Def. Mem. at 11-12.)  Why announce a

policy you already have and that everyone — except, apparently, Jim DeAngelo — already

follows?

Ms. Zamora testified that she believed that Yellowbook may have terminated Mr.

DeAngelo not for signing copy sheets, but because he was undergoing cancer treatments and his

sales numbers fell as a result.  (Zamora Tr. at 64.)  And her testimony is wholly consistent with

that of Mr. Cianciullo, who stated that, once Mr. Benjamin saw the copy sheets on which Mr.

DeAngelo had signed his name, his question to Human Resources was not "should" we terminate

him, but "<u>can</u> we terminate [him]." (Cianciullo Tr. at 146-47 (emphasis added).) Clearly, they were eager to do so.

**F.**     **<u>Prior to Terminating Mr. DeAngelo, Messrs. Benjamin and Cianciullo Knew that he Planned on Taking FMLA Leave.</u>**

Approximately three weeks prior to his termination, Mr. DeAngelo was in active discussions with Yellowbook's leave coordinator about taking FMLA leave. (Exh. O; PJR 1 at 109 (DeAngelo).) As Yellowbook concedes, Mr. DeAngelo formally requested FMLA leave from Yellowbook at 7:28 a.m. on February 22, 2011 — the early morning hours of the same day he was terminated. (Exh. V, Email from J. DeAngelo (Feb. 22, 2011); Corcoran Tr. at 146-47.) He followed up later that morning by faxing the Company his doctor's letter documenting his medical condition (Exh. P), and Human Resources Manager Bri Carson entered his request into the Company's computer system that same day (Corcoran Tr. at 152-53).

Messrs. Cianciullo and Benjamin met with Mr. DeAngelo twice on the day they terminated him. At their first meeting, they did not terminate him. Instead, they simply asked him whether he had signed his own name to the copy sheets, to which Mr. DeAngelo answered without hesitation that he did. (PJR 1 at 115-16 (DeAngelo).) At this same meeting, Mr. DeAngelo showed his supervisors the FMLA letter from his doctor. He told them: "I have a leave of absence letter from my doctor and I'll be taking FMLA." (*Id.* at 225 (DeAngelo).) Messrs. Cianciullo and Benjamin simply told Mr. DeAngelo that he would have to speak to Human Resources about that. (*Id.* at 117-18 (DeAngelo).)

It was only at the <u>second</u> meeting — approximately one or two hours after Mr. DeAngelo notified his supervisors that he was taking FMLA leave — that Yellowbook terminated him. (PJR 1 at 118 (DeAngelo).) Thus, while one could debate whether Mr. DeAngelo's supervisors knew about his plan to take FMLA leave based solely on his conversations with leave

coordinator Bri Carson or his formal request for leave in the early morning hours of the day on which he was fired.  But there can be no debate that Messrs. Cianciullo and Benjamin definitively knew that Mr. DeAngelo intended to take FMLA leave when he showed them his leave letter during that first meeting and announced his intention to do just that.

## II.     PROCEDURAL BACKGROUND

Mr. DeAngelo filed suit against Yellowbook in Connecticut Superior Court on February 16, 2012, alleging disability discrimination under the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-51 *et seq.*, and interference with and retaliation against his exercise of his rights under Connecticut's Family and Medical Leave Act (FMLA), *id.* § 31-51kk *et seq.*  On April 5, 2012, Yellowbook removed the case to the United States District Court for the District of Connecticut on the basis of diversity of citizenship.  *See* Dkt. No. 1; *see also* 28 U.S.C. § 1332.  Mr. DeAngelo filed his First Amended Complaint on May 23, 2012, withdrawing his Connecticut FMLA claim, which must be pursued through the Connecticut Department of Labor, *see* Conn. Gen. Stat. § 31-51pp(c)(2), and adding a claim for disability discrimination under the federal Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.  See* Dkt. No. 17.  He amended his complaint a second time on November 12, 2012,  adding allegations for interference with and retaliation against his exercise of his rights under the federal FMLA, 29 U.S.C. § 2601 *et seq.  See* Dkt. No. 27.

On March 27, 2013, Mr. DeAngelo moved for a prejudgment remedy against Yellowbook, pursuant to Federal Rule of Civil Procedure 64 and Connecticut General Statute § 52-278a *et seq.  See* Dkt. No. 37.  The Court held hearings on the Motion on May 22 and 23, 2013.  *See* Dkt. Nos. 50-51.  The Motion is currently pending.

### III.    LEGAL STANDARD

Summary judgment is a "drastic procedural weapon because [it] cuts off a party's right to present his case to the jury." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988).  A district court may grant summary judgment only if the evidence, viewed in the light most favorable to the non-movant, presents no genuine issue of material fact, *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir. 1996), and the movant is entitled to judgment as a matter of law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant, *see Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995), and the movant has the burden of showing that no genuine factual dispute exists, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (reversing summary judgment in discrimination case).

Summary judgment dismissal is particularly disfavored in employment cases where the employer's "intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *accord Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) ("We have repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."); *see also Picataggio v. Romeo*, 36 Conn. App. 791, 794 (1995) ("A question of intent raises an issue of material fact, which cannot be decided on a motion for summary judgment." ).  "Because writings directly supporting a claim of discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo*, 22 F.3d at 1224.

## IV.    ARGUMENT

## A.    <u>Summary Judgment on Mr. DeAngelo's CFEPA Claim Should Be Denied.</u>

Jim DeAngelo alleges that Yellowbook violated Connecticut's Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-51 *et seq.*, when it terminated him because he had cancer.  The CFEPA prohibits employment discrimination on the basis of disability, among numerous other characteristics.  *Id.* § 46a-60(a)(1).  Yellowbook argues that it is entitled to summary judgment on Mr. DeAngelo's CFEPA claim because (1) Mr. DeAngelo's cancer did not qualify as a disability under the CFEPA; (2) the CFEPA requires Mr. DeAngelo to prove that his disability was a "but-for" cause of his termination, which he cannot do; or (3) Mr. DeAngelo cannot prove that his disability was even a motivating factor of his termination.  Given the broad language of the CFEPA and the substantial evidence of discrimination marshaled by Mr. DeAngelo, each of Yellowbook's arguments must fail.

### 1.    Mr. DeAngelo Was Disabled Under the CFEPA.

Yellowbook first claims that Mr. DeAngelo's cancer did not qualify as a "physical disability" under the CFEPA.  This argument is meritless.  The Connecticut legislature chose a sweeping definition of "physical disability" under the CFEPA:

> <u>any chronic physical handicap, infirmity or impairment,</u> whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device.

Conn. Gen. Stat. § 46a-51(15) (emphasis added).  As numerous Connecticut courts have held, that definition is easily capacious enough to include cancer.  *See, e.g.*, *Berube v. Great Atl. & Pac. Tea Co.*, 2010 WL 3021522 at *11 (D. Conn. Jul, 29, 2010) (Bryant, J.) (skin cancer); *Ferrucci v. SNET*, 2005 WL 2207709 at 9 (Conn. Super. Aug. 17, 2005) (Lopez, J.) (prostate cancer).

18

The CFEPA's definition of disability is <u>broader</u> than the definition of disability under the federal Americans with Disabilities Act (ADA), 42 U.S.C. § 12102.  *See, e.g.*, *Beason v. United Techs.*, 337 F.3d 271, 277-78 (2d Cir. 2003).  And yet it is quite clear that cancer is disability even under the more restrictive definition of the ADA.  *See, e.g.*, *Cyrus v. Papa's Dodge, Inc.*, 2012 WL 1057310 at *3 (D. Conn. Mar. 28, 2012) (Eginton, J.); *see also* 29 C.F.R. § 1630.2(j)(3)(ii)-(iii) (stating that cancer is a disability "in virtually all cases").  Indeed, cancer qualifies as a disability under the ADA even if it is in remission.  *See, e.g.*, *Katz v. Adecco*, 845 F. Supp. 2d 539, 548 (S.D.N.Y. 2012) (Baer, J.); *see also* 29 C.F.R. § 1630.2(j)(1)(vii).

To all this, Yellowbook responds that a disability under the CFEPA must be "chronic," Conn. Gen. Stat. § 46a-51(15), meaning "of long duration, or characterized by slowly progressive symptoms; deep-seated or obstinate, or threatening a long continuance; distinguished from acute."  *Shaw v. Greenwich Anesthesiology Assocs.*, 137 F. Supp. 2d 48, 65 (D. Conn. 2001) (Dorsey, J.) (quoting <u>Black's Law Dictionary</u> (6th ed. 1990)), *abrogated on other grounds by Beason*, 337 F.3d at 281.  (Def. Mem. at 12-14.)  And Mr. DeAngelo's cancer, Yellowbook says, was not chronic because it only "last[ed] a few months."  (*Id.* at 14.)

As an initial matter, Yellowbook seems to ignore the "threatening a long continuance" component of the *Shaw* court's definition of "chronic," which cannot reasonably be denied here. (*See* Exh. W, Yale Cancer Center, at 3 (noting Mr. DeAngelo's doctor's "suspicion for recurrent lymphoma" more than 14 months after Mr. DeAngelo's termination).)  Putting that aside, though, Yellowbook's argument nonetheless cannot withstand even a cursory review of the evidence.  Mr. DeAngelo's healthcare provider wrote on February 18, 2011 — <u>four days before Mr. DeAngelo's termination</u> — that Mr. DeAngelo was undergoing active treatment for cancer and that "require[d] a leave of absence."  (Exh. P.)  During the time he requested this leave, Mr.

DeAngelo was still undergoing chemotherapy.  (Exh. W, Yale Cancer Center, at 25.)  And the chemotherapy — the "pumping [of] poison into [Mr. DeAngelo's] bloodstream" — left him feeling "[h]orrible."  (PJR 1 at 228-29 (DeAngelo); *see also* PJR 2 at 202 (the Court) ("[Chemotherapy] is quite notorious for just making you feel like hell . . . .").)  The fact that Yellowbook "pull[ed] the plug on" Mr. DeAngelo's health insurance when it terminated him (PJR 1 at 140 (DeAngelo)), forcing him to miss scheduled doctor's visits (Exh. X, Pl. Interrogs., at 10), hardly means that his cancer treatment had concluded.[14]

### 2. Mr. DeAngelo Can Prove the Causation Element of his CFEPA Claim.

Yellowbook's next argues that, in order to state a claim under the CFEPA, Mr. DeAngelo must prove that his disability was a "but-for" cause of his termination.  Not only can Mr. DeAngelo not do that, Yellowbook says, but he cannot even demonstrate that his disability was a "motivating factor" in Yellowbook's decision to terminate him.

Yellowbook is wrong on all fronts.  As an initial matter, the CFEPA does not require "but-for" causation.  But even it if does, "but-for" causation is not an insurmountable standard, and it is easily satisfied by the mountain of evidence here.

---

[14]  The excerpts from Mr. DeAngelo's medical records — upon which Yellowbook relies for its hollow claim that Mr. DeAngelo was 100% healthy just three months after his cancer diagnosis — tell only half the story.  (*See* Def. Mem. at 5 (citing Def. Exhs. A, C).)  The defendant conspicuously fails to mention that, directly following the visits in which Mr. DeAngelo reported feeling better, he received yet another round of chemotherapy treatment.  (Exh. W, Yale Cancer Center, at 31 ("Jim . . . will be receiving his fourth [chemotherapy] cycle today."); *id.* at 25 ("[Jim] is here today for his fifth cycle of [chemotherapy].").)  As Mr. DeAngelo explained, "[i]t takes about 10-14 days for that stuff to start getting out of your system" and that during that time period he felt "worn out."  (PJR 1 at 228-29 (DeAngelo).)  Further, contrary to Yellowbook's assertions, Mr. DeAngelo's reactions to the chemotherapy were sometimes quite severe.  (*See, e.g.*, Exh. W, Yale Cancer Center, at 5 ("[Jim] had a significant infusional reaction with his first dose of [chemotherapy] which led to pulmonary edema requiring hospitalization . . . .").)

a.    The CFEPA Does Not Demand "But-For" Causation.

The U.S. Supreme Court has recently held that federal laws that prohibit discrimination "because of" a plaintiff's protected status or activity require the plaintiff to prove that the status or activity was the "but-for" cause of the discrimination.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2524-25 (2013) (retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a)); *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009) (discrimination under the Age Discrimination in Employment Act (ADEA), 42 U.S.C. § 623). Yellowbook argues that these decisions about <u>federal</u> law mean that plaintiffs under our <u>State</u>'s anti-discrimination law must also prove "but-for" causation.

Yellowbook is incorrect.  The CFEPA only requires plaintiffs to demonstrate that their protected status or activity was a "motivating factor" of their employer's adverse action.  The comparative structures and histories of federal anti-discrimination law and the CFEPA demonstrate that, regardless of the U.S. Supreme Court's pronouncements on federal law, the "motivating factor" test remains the standard under Connecticut's anti-discrimination statute.

First, while federal law distinguishes between different kinds of discrimination, Connecticut law does not.  Federal law, for example, treats age discrimination differently from many other forms of unlawful discrimination.  *Compare* ADEA, 29 U.S.C. § 621 *et seq.* (regulating age discrimination <u>only</u>), *with* Title VII, 42 U.S.C. § 2000e *et seq.* (discussing numerous protected categories <u>other than</u> age).  Under the CFEPA, however, the many protected categories that employers are prohibited from considering are lumped together into one statute. *See* Conn. Gen. Stat. § 46a-60(a)(1) (prohibiting discrimination on the basis of "race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability or physical

disability"). None has a different status or station from any other. Thus, while federal law logically could treat certain kinds of discrimination differently from others, since numerous distinct statutes govern, the structure of Connecticut law does not support any such distinction. But-for causation, then, must be applied to the entire CFEPA or to none of it. *Cf. Dwyer v. Waterfront Enters.*, 2013 WL 2947907 at *7 (Conn. Super. May 24, 2013) (Fischer, J.) ("It would be largely unworkable to ascribe different interpretations to the same language in the same statute depending on the context in which the statute is invoked.").

Second, the divergent histories of federal anti-discrimination law and the CFEPA demonstrate that the U.S. Supreme Court's reasoning cannot be applied to the CFEPA. In holding that "because of" text yields "but-for" causation, the U.S. Supreme Court observed that Congress had amended Title VII to mandate a "motivating factor" test, but it had not similarly amended other statutes concerning other forms of discrimination. *See, e.g.*, *Gross*, 557 U.S. at 174. The Court found that divergent legislative treatment revealing. *See id.* at 174-75 ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."). The Connecticut legislature, in contrast, has never altered the standard of proof under the CFEPA, despite making numerous other amendments to the statute. *See Wagner v. Bd. of Trustees of Conn. State Univ.*, 2012 WL 669544 at *11 (Conn. Super. Jan. 30, 2012) (Peck, J.). Furthermore, the CFEPA was enacted in the late 1940s — more than 15 years before the federal Civil Rights Act and 20 years before the ADEA — so it cannot reasonably be understood as modeled on any corollary federal statute.

Finally, although Connecticut's courts have often looked to federal precedent in their interpretation of Connecticut's anti-discrimination protections, *see Vollemans v. Town of Wallingford*, 103 Conn. App. 188, 225 (2007) (McLachlan, J., dissenting), Connecticut has

22

always remained "the final arbiter of its own laws," *id.* at 199-200 (majority opinion) (quoting *Johnson v. Manson*, 196 Conn. 309, 319 (1985)).  Accordingly, federal civil rights statutes establish the <u>minimum</u> amount of protection for individuals: Connecticut is always free to provide more protection.  *See CHRO v. Savin Rock Condo. Assn.*, 273 Conn. 373, 386 n. 11 (2005); *Corcoran v. German Soc. Soc'y*, 99 Conn. App. 839, 843 (2007).  So it is that the Connecticut Appellate Court, for example, concluded in *Vollemans* that the statutory 180-day period for filing discrimination claims under the CFEPA commences with the actual cessation of employment, rather than notice thereof, 103 Conn. App. at 218, despite the U.S. Supreme Court's contrary, more restrictive holding under the federal Civil Rights Act, *see id.* at 200-03 (discussing *Del. State Coll. v. Ricks*, 449 U.S. 250 (1980)).  In so holding, the Appellate Court was guided — as this Court should be — by the Connecticut Supreme Court's consistent admonition that the CFEPA is a "remedial statute" that should be "liberally construed in favor of those whom the legislature intended to benefit."  *Id.* at 197 (quoting *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995)); *accord, e.g.*, *CHRO v. Trulove & Maclean, Inc.*, 238 Conn. 337, 355 (1996).

All of these reasons have led the only Connecticut courts to consider the standard of proof under the CFEPA after *Gross* and *Nassar* to conclude that the "motivating factor" test remains the proper standard under the CFEPA.  *See Wagner*, 2012 WL 669544 at *10-*12; *Dwyer*, 2013 WL 2947907 at *4-*8; *cf. also  CHRO v. Forvil*, 302 Conn. 263, 277 n.13 (2011) (applying *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which the U.S. Supreme Court rejected in *Gross* and *Nassar*, to CFEPA claims); *Marasco v. Conn. Reg'l Vocational-Technical Sch. Syst.*, 2012 WL 5476905 at *5-*6 (Conn. Super. Oct. 15, 2012) (Dooley, J.) (allowing "mixed motive theory" under CFEPA).  Connecticut's federal courts have agreed.  *See, e.g.*,

*Weber v. FujiFilm Med. Sys. U.S.A.*, 2012 WL 681681 at *8 n.7 (D. Conn. Feb. 28, 2012)

(Arterton, J.) ("Although . . . the Supreme Court held in *Gross* . . . that the mixed-motive analysis

does not apply to ADEA claims, neither Connecticut courts nor the Second Circuit have yet

addressed the impact of *Gross* on CFEPA claims.  The Court will therefore apply the mixed

motive analysis to Mr. Weber's CFEPA claims." (citing *Herbert v. Nat'l Amusements, Inc.*, 833

F. Supp. 2d 192, 202-03 (D. Conn. 2011) (Bryant, J.)).[15]

> b.    <u>Even If "But-for" Causation Applies Under the CFEPA, It Works Only a
> Minor Change.</u>

Yellowbook characterizes "but-for" causation as an extremely demanding standard that

few if any plaintiffs could hope to surmount.  In reality, though, "but-for" is nothing more than

the standard of causation that applies to all common law tort claims, and it is the same standard

that has applied to the mine-run of discrimination cases for the past 40 years.

At the outset, it is helpful to understand what "but-for" causation is <u>not</u>.  Specifically,

"but-for" causation does <u>not</u> mean that the protected status or activity was the <u>sole cause</u> of the

employer's adverse action.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n.10

(1976) (distinguishing discharge "solely on the basis of race" from showing that "race was a

'but-for' cause); *see also Lewis v. Humboldt Acquisition Grp.*, 681 F.3d 312, 314-17 (6th Cir.

2012) (en banc) (rejecting "sole-cause standard" under Americans with Disabilities Act,

42 U.S.C. § 12112(a), in favor of "but-for" standard); *Saviano v. Town of Westport*, 2011 WL

4561184 at *6 (D. Conn. Sept. 30, 2011) (Chatigny, J.) (holding that "but-for" causation "does

---

[15]  While the Second Circuit applied "but-for" causation to the CFEPA, it did so without any
reasoning.  *See Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 22 n.2 (2d Cir. 2011).  In the other
case Yellowbook cites, meanwhile, "the parties agreed that the same standards appl[ied]" to the
ADEA and CFEPA claims, *Miller v. Hartford Fire Ins. Co.*, 652 F. Supp. 2d 220, 228 (D. Conn.
2009) (Hall, J.) — a concession Mr. DeAngelo does not make.

not mean . . . that [the plaintiff] is required to establish retaliation was the sole reason for his termination").

    This distinction between but-for and sole causation makes logical sense. Imagine, for example, an employer's edict terminating all blind people over 50 years of age, pursuant to which the employer fires a 55-year-old blind person. Neither disability nor age was a sole cause of the employee's termination, but unlawful discrimination nonetheless has surely occurred. *Cf. Fagan v. U.S. Carpet Installation*, 770 F. Supp. 2d 490, 496-97 (E.D.N.Y. Mar. 10, 2011) (rejecting argument that plaintiffs must lose under *Gross* because they claimed that they experienced sex discrimination as well as age discrimination); *accord Ries v. Winona Cnty.*, 2010 WL 3515722 at *10 (D. Minn. Jul. 28, 2010); *cf. Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[W]here two bases of discrimination exist, the two grounds cannot be neatly reduced to distinct components.").[16]

    If "but-for" causation does not mean "sole cause," then what does it mean? The Supreme Court tells us that but-for causation is satisfied where "the employee's protected trait actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Gross*, 557 U.S. at 176 (2009) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)) (emphasis omitted). Put another way, it is simply an act that makes something

---

[16]  A federal district court offered a different illustration, this one using the language of mathematics:

> If a decision-maker requires a motivational level of 10 in order to take adverse action against an employee and if age-related bias gives the decision-maker 5 levels of motivation, while another consideration gives the decision-maker an additional 5 levels of motivation, then age-related bias and the other consideration both constitute "but-for" causes of the adverse action, although neither qualifies as a "sole" cause.

*EEOC v. City of Greensboro*, 2010 WL 5169080 at *8 n.22 (M.D.N.C. Dec. 14, 2010).

happen or without which something would not happen. *See Nassar*, 133 S. Ct. at 2525 (requiring

"the plaintiff to show that 'the harm would not [otherwise] have occurred'" absent the protected

act) (quoting <u>Rest. (1st) Torts</u> § 431); *see also Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273,

1277 (10th Cir. 2010) ("factor that made a difference"). A but-for cause can be one cause among

many, so long as it is a cause that determines the outcome. *Cf. Loughman v. Consol-Pa. Coal

Co.*, 6 F.3d 88, 106 (3d Cir. 1993) (Becker, J.) ("As both tort law and common sense tell us,

there may be multiple but-for causes of a single loss and each, as a but-for cause, may be

responsible for the entire loss in the sense that had that party not acted as it did, there would have

been no loss.").[17]

Gross* and *Nassar* did not change the governing standard under federal anti-

discrimination law: they only made that standard more widely applicable. In fact, Mr.

DeAngelo's burden under a but-for test is no different from the standard that has prevailed in the

Second Circuit — and many others — for decades. *Compare Gross*, 557 U.S. at 176

("determinative influence"), *with, e.g.*, *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 83 (2d Cir.

1983) (holding under pre-*Gross* ADEA that, "although age must be a determinative factor, it

need not be the only determinative factor"); *see also, e.g.*, *Jones*, 617 F.3d at 1277 (observing

that "*Gross* does not disturb longstanding Tenth Circuit [ADEA] precedent" requiring age to be a

determinative factor); *cf. Lewis v. Humboldt Acquisition Grp.*, 681 F.3d 312, 341 (6th Cir. 2012)

(en banc) (Donald, J., concurring in part and dissenting in part) (observing that "some courts

---

[17]  Far from restricting federal anti-discrimination statutes into obscurity, the but-for test — at least according to a recent dissenting opinion from four of the five Supreme Court justices who comprised the *Gross* and *Nasser* majorities — actually imposes "a boundless theory of liability," under which liability attaches wherever the protected trait "played any part, even the slightest, in producing the injury." *CTX Transp. v. McBride*, 131 S. Ct. 2630, 5645 (2011) (Roberts, C.J., dissenting).

have actually defined 'motivating factor' and 'but-for' as meaning precisely the same thing") (citing *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1033-34 (7th Cir. 1999)).

*Gross* and *Nassar* do not alter the standard of causation in discrimination cases based upon pretext. All they do is clarify that "mixed motive" instructions — and the attendant shifting of the burden of persuasion to the defendant — are improper under federal anti-discrimination statutes without some specific legislative mandate (such as the one in the Civil Rights Act of 1991).[18] *See Gorzynski*, 596 F.3d at 106; *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) ("*Gross* stands for the proposition that it is improper to shift the burden of persuasion to the defendant in an age discrimination case."). The causation standard in pretext cases remains what it has always been: "the plaintiff must show that age was a causative or determinative factor, one that made a difference in deciding whether the plaintiff should be employed." *Geller v. Markham*, 635 F.3d 1027, 1035 (2d Cir. 1980) (quoting with approval *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979), as holding that "plaintiff must prove that age was the '"determining factor" in his discharge in the sense that "but for" his employer's motive to discriminate against him because of age, he would not have been discharged'"); *see also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000) (approving district court

---

[18]  Plaintiffs may prove employment discrimination in one of two ways. Under the "pretext" mode of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the burden of persuasion "remains at all times with the plaintiff," who must show that "that the [employer's] proffered reason was not the true reason for the employment decision." *E.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993). Under the "mixed-motive" mode of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), in contrast, the plaintiff "is not required to prove that the employer's stated reason [for the adverse action] was a pretext." *E.g.*, *Holcomb v. Iona Coll.*, 521 F.3d 130, 141-42 (2d Cir. 2008) (emphasis omitted). Rather, in these cases, "once a plaintiff . . . shows that [impermissible considerations] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [those considerations] to play such a role." *Price Waterhouse*, 490 U.S. at 245 (1989). In that way, *Price Waterhouse* "shift[s] the burden of persuasion to defendant if plaintiff succeeds in showing a discriminatory motive." *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 161 (2d Cir. 2001).

instruction that jury hearing ADEA case must find that plaintiff's "age was a determining and motivating factor").

              c.       <u>The Evidence Here Amply Supports But-For Causation.</u>

Ultimately, this Court does not need to decide whether "motivating factor" or "but-for" causation applies under the CFEPA, because Mr. DeAngelo's claims survive summary judgment under either standard. *Cf. Bolmer v. Oliveira*, 294 F.3d 134, 148-49 (2d Cir. 2010) (declining to decide whether *Gross* applies to ADA, because "even if *Gross* requires [the plaintiff] to show that [the defendant's] discriminatory stereotyping was the 'but-for' cause of [the adverse action], we cannot conclude as a matter of law that he has failed to satisfy this more stringent causation standard.").

Even under *Gross* and *Nassar*, pretext remains the linchpin of summary judgment. Where, as here, the plaintiff raises substantial questions about the legitimacy of the employer's purported nondiscriminatory reason for termination, summary judgment is inappropriate. *See Gorzynski*, 596 F.3d at 107 (vacating summary judgment in post-*Gross* ADEA case and emphasizing that "it is important to consider whether the explanations that JetBlue gave for Gorzynski's firing were pretextual"); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 503-06 (2d Cir. 2009) (vacating summary judgment in post-*Gross* ADEA case based upon *prima facie* case and "additional evidence of pretext"). This is so because "[p]roof that the defendant's explanation is unworthy of credence . . . may be quite persuasive" in proving intentional discrimination. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). Indeed, "unless the defendants' proffered nondiscriminatory reason is dispositive and forecloses any issue of material fact, summary judgment is inappropriate." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004).

Yellowbook argues that it terminated Mr. DeAngelo because he violated Company "policy" prohibiting salespeople from signing customer copy sheets. (*E.g.*, Def. Mem. at 11-12.) The evidence, however, demonstrates the falsity of that explanation. In reality, numerous non-disabled Yellowbook employees — including at least three members of management — committed the same "cardinal sin" as Jim DeAngelo, yet none of them received any discipline at all.[19] Former Yellowbook supervisor Nancy Montgomery and salespeople Mike Brereton and Danielle Zamora each testified that signing customer copy sheets was a common practice. *See* section I.E.2 *supra*. And both Mr. Brereton and Ms. Zamora testified that they witnessed Mr. DeAngelo's direct supervisor, Joe Cianciullo, sign copy sheets without any hesitation. Indeed, according to Mr. Brereton, Mr. Cianciullo even signed the customer's name to copy sheets on several occasions. *See id.*[20]

---

[19] Yellowbook's decision to terminate Mr. DeAngelo, rather than follow its own progressive discipline policy (which would have resulted, at worst, in a written warning) (Cianciullo Tr. at 62-63), renders its disparate treatment of Mr. DeAngelo particularly stark. *See, e.g.*, *Kauffman v. Maxim Healthcare Servs., Inc.*, 2006 WL 1983196 at *7 (E.D.N.Y. 2006) (Platt, J.) ("Defendant's failure to follow its own 'progressive discipline policy' of notifying Plaintiff of his inadequate performance [supports] Plaintiff's argument that th[e] proffered reason for his termination was simply a pretext for unlawful discrimination and retaliation."); *Sklaver v. Casso-Solar Corp.*, 2004 WL 1381264 at *9 (S.D.N.Y. 2004) (Conner, J.) (same); *cf. Moran v. Premier Educ. Grp., LP*, 599 F. Supp. 2d 263, 278 (D. Conn. 2009 ) (Squatrito, J.) ("[T]he lack of any warning or progressive discipline by the Defendant could lead a reasonable jury to find pretext.").

[20]    Mr. Cianciullo's credibility is a decidedly open question. First, he denied that he ever signed copy sheets, despite the contrary testimony of two eyewitnesses, Mr. Brereton and Ms. Zamora, both of whom he conceded were both truthful people. (PJR 2 at 151-52 (Cianciullo).) Second, even though at least five witnesses testified that signing of copy sheets was a common practice, Mr. Cianciullo nonetheless asserted that Jim DeAngelo was the only Yellowbook employee he ever knew to sign copy sheets (Cianciullo Tr. at 127). Third, Mr. Cianciullo significantly understated the number of times he himself had been reported to Yellowbook's Human Resources department for sexual harassment and other misconduct (*id.* at 224-25; Zamora Tr. at 74-87; PJR 2 at 180-88 (Cianciullo)). In light of these issues, the Plaintiff has moved to compel the production of Mr. Cianciullo's personnel file. (Dkt. No. 56.) The Motion is currently pending.

Far from prohibiting the signing of copy sheets, Yellowbook's policy was at most akin to "Don't Ask, Don't Tell."  Indeed, when pressed to identify <u>any other Yellowbook employee</u> in the whole country who had been fired for signing copy sheets, its corporate human resources director could not do so.  *See* section I.E.3 *supra*.  The only reasonable inference is that Yellowbook singled out Mr. DeAngelo because he was not like everyone else: he had cancer and requested medical leave.  *See Gorzynski*, 596 F.3d at 109 & n.7 (denying summary judgment, in part because of employer's disparate enforcement of workplace policies); *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998) (holding "Hilton's inconsistent application of its disciplinary policy was sufficient for the jury to have decided properly that the employer's defense was simply a pretext for discrimination").

To all this, Yellowbook responds, at least in part, that there is "no evidence that [Odded] Benjamin, [Mr. DeAngelo's manager and] the decision maker, was aware that another employee signed copy sheets and then did not terminate that employee."  (Def. Mem. at 19.)  But Yellowbook's argument fails for three reasons.  First, there <u>is</u> evidence that Mr. Benjamin not only knew about the signing of copy sheets, but also that he signed them himself.   Mr. Brereton, for example, described the following typical scene when Yellowbook was finalizing its publication — a scene that included Mr. Benjamin:

> [A]s we were getting towards the end of a book, when the book's closing, everyone's like going up to the secretary at once.  And she would yell out, like, 'These copy sheets aren't signed,' say, to Nancy [Montgomery] or Joe [Cianciullo] or [another supervisor named] Gina. . . . <u>[Manager] Odded [Benjamin] even, you know, he managed some people</u>.  And they would — managers would take the copy sheets back and five minutes later, they'd mysteriously all be signed.  So I didn't see anybody do it, but I'm not — you know, put two and two together, you know who signed them.

(Brereton Tr. at 57 (emphasis added).)  Moreover, the practice of signing copy sheets was so widespread, *see* section I.E.2 *supra*, that a jury could easily conclude that Mr. Benjamin had to have known about it.

Second, the evidence demonstrates that Mr. DeAngelo's supervisor, Joe Cianciullo, knew about salespeople signing customers copy sheets and yet did nothing about it.  To the contrary, he joined in.  *See* section I.E.2 *supra*.  When Yellowbook "learned" that Mr. DeAngelo signed copy sheets, however, Mr. Cianciullo offered his recommendation to Mr. Benjamin that Mr. DeAngelo should be terminated.  (PJR 2 at 165-66 (Cianciullo).)  And Mr. Cianciullo knew that Mr. Benjamin valued and trusted his opinion.  (*Id.* at 189-90 (Cianciullo).)  Accordingly, even if Mr. Benjamin were the ultimate decision-maker, Mr. Cianciullo's demonstrated bias tainted the entire decision-making process.  *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) ("Animus and responsibility for the adverse action can both be attributed to the earlier agent . . . if the adverse action is the intended consequence of that agent's discriminatory conduct."); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004); *cf. Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 360 (S.D.N.Y. 2012) (Oetken, J.) (denying summary judgment under "cat's paw" theory because "no evidence shows that [the supervisor's] potential bias did not influence the [termination] decision").

Finally, <u>even if</u> Mr. Benjamin did not participate in or know about the signing of customer copy sheets, and <u>even if</u> Mr. Cianciullo had no impact on the termination decision, direct evidence still demonstrates Mr. Benjamin's disparate treatment of Mr. DeAngelo.  In 2009, before he was disabled, Mr. DeAngelo signed one or two customer <u>contracts</u>.  (PJR 1 at 144 (DeAngelo); Exh. G at ¶ 2.)  Yet when Mr. Benjamin found out, he did not give Mr. DeAngelo so much as a formal warning, let alone terminate him.  (*Id.* at 146.)  At that time, of

course, Mr. DeAngelo was healthy and an exceptional producer for Yellowbook.   (Montgomery

Tr. at 73; PJR 2 at 120 (Cianciullo).)  There is no better comparator for a disabled Jim DeAngelo

than a <u>healthy</u> Jim DeAngelo.[21]

    The evidence would easily permit a reasonable jury to find that Mr. DeAngelo's

disability was a but-for cause of his termination.  Thus, summary judgment must be denied.

**B.**    **<u>Summary Judgment Should Be Denied on Mr. DeAngelo's ADA Claim</u>**

    In addition to his CFEPA claim, Mr. DeAngelo also alleges that Yellowbook violated his

rights under the federal Americans with Disabilities Act (ADA) as amended, which prohibits

discrimination "on the basis of disability in regard to" employment decisions.  42 U.S.C.

§ 12112(a).  The evidence that requires the denial of summary judgment on Mr. DeAngelo's

CFEPA claim compels the same result on his ADA claim.

    As explained above, regardless of the applicable causation standard, Mr. DeAngelo has

marshaled ample evidence to demonstrate that Yellowbook treated him differently than non-

disabled employees who committed the same — or even more serious — misconduct.  *See*

section IV.A.2.c *supra*.  This is the *sine qua non* of discrimination.  *Cf., e.g.*, *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 805 (1973) ("[An employer] may justifiably refuse to rehire one

who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike

to members of all races.").  Accordingly, summary judgment is inappropriate, and this Court can

deny Yellowbook's motion without deciding whether *Gross* and *Nassar* abrogate Second Circuit

precedent regarding the ADA, *see, e.g.*,  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 336

---

[21]  Lest Yellowbook suggest that Mr. DeAngelo's 2009 actions justified his termination, Joe
Cianciullo testified that the <u>only</u> reason why Yellowbook terminated Mr. DeAngelo was for
signing his own name to copy sheets.  (PJR 2 at 155-56 (Cianciullo); Cianciullo Tr. at 129; *see*
*also* Montgomery Tr. at 76-77 (describing how Mr. Benjamin was particularly upset with Mr.
DeAngelo because Mr. Benjamin "had given him leeway with regard to his illness," not because
Mr. DeAngelo had previously signed contracts).)

(2d Cir. 2000) (applying "mixed-motive analysis" to ADA claims) — an issue about which this Circuit's district courts are divided. *Compare Najjar v. Mirecki*, 2013 WL 3306777 at *7 (S.D.N.Y. Jul. 2, 2013) (Forrest, J.) (refusing to "extend *Gross* [to the ADA] absent guidance from the Second Circuit"), *and Doe v. Deer Mountain Day Camp, Inc.*, 682 F.Supp.2d 324, 343 n.40 (S.D.N.Y. 2010) (Pogue, J.) (same), *with Saviano v. Town of Westport*, 2011 WL 4561184 at *6 (D. Conn. Sept. 30, 2011) (Chatigny, J.) (concluding in dictum that *Gross* applied to pre-amendment ADA, which contained same "because of" language as ADEA, though nonetheless denying employer's motion for summary judgment).

## C.     Summary Judgment Should Be Denied on Mr. DeAngelo's FMLA Interference and Retaliation Claims.

The federal Family & Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, guarantees eligible employees 12 weeks of unpaid leave annually to care for themselves or their family members when they are sick. *See, e.g.*, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724-25 (2003). In order to protect employees' rights to this medical leave, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right protected by the Act. 29 U.S.C. § 2615(a)(1). The statute has been interpreted to prohibit employers from interfering with their employees' attempts to take FMLA leave and from retaliating against employees who have done so. *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004) (discussing 29 C.F.R. § 825.220). Mr. DeAngelo has alleged both FMLA interference and retaliation. He is entitled to reach a jury on both claims.

1.    **The Evidence Requires that Summary Judgment on Mr. DeAngelo's FMLA Interference Claim Be Denied, as Yellowbook Cannot Carry its Burden of Proving that It Would Have Terminated Mr. DeAngelo Regardless of His FMLA Request.**

Yellowbook concedes that Mr. DeAngelo was eligible for and entitled to FMLA leave and that it terminated him before he could exercise his request for such leave.  (Def. Mem. at 22.) It argues that, despite all this, Mr. DeAngelo's FMLA interference claim nonetheless fails because "[his] dismissal would have occurred regardless of [his] request for . . . leave."  (*Id.* (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960-61 (10th Cir. 2002).) Yellowbook, however, bears the burden of proving it would have terminated Mr. DeAngelo regardless of his request.  *See* 29 C.F.R. § 825.216(a)(1); *Cendant Corp. v. Comm'r of Labor*, 276 Conn. 16, 33-34 (2005).  On the evidence presented here, Yellowbook cannot carry that burden.

A jury could easily reject Yellowbook's affirmative defense by finding that, had Mr. DeAngelo not sought FMLA leave, Yellowbook would not have terminated him.  *See Smith*, 298 F.3d at 961.   As explained above, the purported policy under which Yellowbook claims it terminated Mr. DeAngelo was violated with impunity by countless other employees, including members of management.  Yet <u>only</u> Mr. DeAngelo was ever terminated because of it.  *See* sections I.E & IV.A.2.c *supra*.  Yellowbook's disparate enforcement of its purported policy would allow a jury to conclude that Mr. DeAngelo would not have been terminated if he had not requested leave, and it requires the denial of summary judgment on Mr. DeAngelo's interference claim.  *See, e.g.*, *Peterson v. Garmin Int'l, Inc.*, 833 F. Supp. 2d 1299, 1311-14 (D. Kansas 2011) (denying summary judgment on FMLA interference claim because of employer's history of non-enforcement of "discretionary" policy under which it allegedly terminated plaintiff); *Turner v. Parker-Hannifin Corp.*, 2012 WL 1229125 at *4-*6 (W.D. Mich. Apr. 12, 2012) (denying

34

summary judgment on FMLA interference claim because of disparate treatment of plaintiff-

employee).

> 2.  **The Evidence Requires that Summary Judgment on Mr. DeAngelo's FMLA Retaliation Claim Be Denied.**

As to Mr. DeAngelo's FMLA retaliation claim, Yellowbook argues: (1) that Mr.

DeAngelo cannot establish a *prima facie* case because he has not shown that the decision-maker,

Odded Benjamin, was aware of his request for leave; (2) that Mr. DeAngelo must prove that his

FMLA request was the "but-for" cause of his termination in order to recover under the FMLA;

and (3) that Mr. DeAngelo cannot prove but-for causation.  (Def. Mem. at 30.)  Each of

Yellowbook's arguments must fail.

> a.  The Decision-Makers Knew About Mr. DeAngelo's Request.

As an initial matter, the evidence shows that Mr. DeAngelo's manager and supervisor

knew about his request for FMLA leave before they terminated him.  Prior to the termination,

Mr. DeAngelo showed Mr. Benjamin and Mr. Cianciullo the letter from his doctor supporting his

request for FMLA leave, and he told them that he planned to take FMLA leave.  *See* section I.F

*supra*.  Yellowbook, meanwhile, presents no evidence whatsoever about what Mr. Benjamin

knew or when he knew it.  It claims only that "emails demonstrate that [he] first learned of [the]

request [the day after the termination], when he received an automated email noting [Mr.

DeAngelo's FMLA request."  (Def. Mem. at 27; *see also id.* at 8.)  But the email says nothing of

the sort; it merely confirms the entry of the request into Yellowbook's system.  (Def. Exh. M.)

Furthermore, the email to Mr. Benjamin implies that he had "requested" the email confirming

Mr. DeAngelo's leave request (*see id.*), thus suggesting that he knew about the request before he

received the email.  In any event, as the non-movant, Mr. DeAngelo is entitled to the benefit of

all reasonable factual inferences.  *See, e.g.*, *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.

1995).  This includes Yellowbook's knowledge of his FMLA request given the attendant circumstances.

>        b.        The FMLA Does Not Require "But-For" Causation.

The FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided" by the Act.  29 U.S.C. § 2615(a)(1). The Department of Labor, exercising rulemaking powers delegated to it by Congress, *see id.* § 2654, has given § 2615(a)(1) the wide berth that Congress intended.  With respect to the standard of proof in retaliation cases, the regulation in force when Jim DeAngelo was terminated provided that:  "[E]mployers cannot use the taking of FMLA leave as a <u>negative factor</u> in employment actions, such as hiring, promotions or disciplinary actions . . . ."  29 C.F.R. § 825.220(c) (2009) (emphasis added).  The DOL did not choose this sweeping language unintentionally.  Indeed, within the same regulation, it also prohibited employers from retaliating against any employee "because" the employee filed or assisted in an administrative inquiry regarding the Act, *id.* § 825.220(a)(3), thus demonstrating that the agency chose its regulatory language carefully.

The expansive language of § 825.220(c) compelled the only federal appellate court to consider the issue to conclude that, despite *Gross*, proof of discrimination by mixed-motive remains available under the FMLA.  *See Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691-92 (6th Cir. 2009); *accord*, *e.g.*, *Johnson v. Benton Cnty. Sch. Dist.*, --- F. Supp. 2d ----, 2013 WL 765614 at *6-*7 (N.D. Miss. Feb. 25, 2013); *see also Breeden v. Novartis Pharm. Corp.*, 646 F.3d 43, 49 (D.C. Cir. 2011) (noting district court's use of mixed-motive jury instruction).  As a result, the FMLA "forbid[s] an employer from considering an employee's use of FMLA leave when making an employment decision," even if the decision "also rest[s] on other, permissible

36

factors." *Hunter*, 579 F.3d at 692.  Nothing in *Nassar* undermines this conclusion.  *See Chaney v. Eberspaecher N. Am.*, --- F. Supp. 2d ----, 2013 WL 3381437 at *1 n.1 (E.D. Mich. Jul. 8, 2013).

                      c.     <u>Mr. DeAngelo's FMLA Retaliation Claim Survives Under Any Standard of Proof.</u>

Ultimately, this Court need not decide whether the mixed-motive framework of *Price Waterhouse*, 490 U.S. 228, continues to apply to FMLA claims, because Mr. DeAngelo "readily survives summary judgment [even] under the more taxing *McDonnell Douglas* standard." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).  *See generally McDonnell Douglas*, 411 U.S. at 804-05 (describing burden-shifting regime whereby plaintiff must prove that defendant's stated reason for termination is "pretext"); *cf. Potenza*, 365 F.3d at 168 (holding that *McDonnell Douglas* applies to FMLA retaliation claims).

The short temporal proximity between Mr. DeAngelo's requests for FMLA leave and his termination supports a finding of retaliation.  After all, Mr. DeAngelo was terminated less than one month after he first approached Yellowbook about taking FMLA leave and <u>the same day</u> that he had previously submitted a doctor's letter supporting that leave.  *Cf. Rhodes v. Arc of Madison Cnty.*, 920 F. Supp. 2d 1202, 1239 (N.D. Ala. 2013) (finding FMLA interference where employer terminated employee on dubious grounds less than two weeks before employee's noticed FMLA leave was scheduled to begin); *Rabe v. Nationwide Logistics*, 530 F. Supp. 2d 1069, 1075 (E.D. Mo. 2008) (relying on temporal proximity to deny summary judgment in FMLA interference case).  Yellowbook responds that "[m]ere temporal proximity, standing alone, is insufficient" to demonstrate pretext.  *See* Def. Mem. at 29 (quoting *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 410 (S.D.N.Y. 2007)).  That may be true in some cases.  Here, however, temporal proximity does not "stand[] alone."  To the contrary, as Mr. DeAngelo

has already established, there is substantial evidence from which a jury could conclude that Yellowbook's stated reason for selecting him for termination was false.  *See* sections I.E & IV.A.2.c *supra*.  Accordingly, summary judgment must be denied.  *See, e.g.*, *Reeves*, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

## V.      CONCLUSION

Yellowbook says it terminated Jim DeAngelo for signing customer copy sheets, a practice that, despite its apparent ubiquity, had never resulted in any discipline — let alone termination — anywhere in the country.  A jury could easily find Yellowbook's explanation unworthy of belief, and conclude instead that Mr. DeAngelo was actually fired because his employer considered his cancer treatment and his request for medical leave inconvenient.  In other words, it could find that Mr. DeAngelo's termination violated federal and state law. Accordingly, summary judgment is inappropriate, and Mr. DeAngelo should be permitted to present his case to a jury.

**RESPECTFULLY SUBMITTED**
**THE PLAINTIFF**

By:_____/s/ Nina T. Pirrotti_____
     Nina T. Pirrotti (ct26792)
     Joshua R. Goodbaum (ct28834)
     GARRISON, LEVIN-EPSTEIN, RICHARDSON,
          FITZGERALD & PIRROTTI, P.C.
     405 Orange Street
     New Haven, CT 06511
     Tel.:    (203) 777-4425
     Fax:    (203) 776-3965
     NPirrotti@garrisonlaw.com
     JGoodbaum@garrisonlaw.com

38

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of August, 2013, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.

_/s/ Nina T. Pirrotti_____
Nina T. Pirrotti
