# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES DEANGELO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:12-cv-520 (GWC) |
| | ) | |
| YELLOWBOOK INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER RE:
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### (Doc. 61)

Plaintiff James DeAngelo brought this action against his former employer, defendant Yellowbook Inc., alleging disability discrimination in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 ("CFEPA"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), as well as interference with and retaliation for the exercise of rights under the Family and Medical Leave Act, 29 U.S.C. § 2615 ("FMLA"). (Doc. 27.)  Yellowbook moves for summary judgment on all claims.  (Doc. 61.)  For the reasons stated below, Yellowbook's motion for summary judgment is DENIED.

## I.      Facts

### A.      DeAngelo's Position at Yellowbook

James DeAngelo began working in sales as an Account Representative at Yellowbook Inc.[1] in 2005.[2]  By October 2006 he had transferred to Yellowbook's Milford office, where he worked until his employment was terminated in February 2011.  As an Account Representative, DeAngelo sold both print and online advertising to new and existing customers.  (Doc. 51 at 14-15.)  From 2009 until his termination in 2011, DeAngelo's direct supervisor was Joe Cianciullo,

---

[1]  In January 2013, Yellowbook's corporate name was changed to hibu Inc.  (Doc. 62 at 1 n.1.)

[2]  Unless otherwise cited, facts are drawn from the parties' Local Rule 56(a)(1) statements. (Docs. 63, 69, 70).  Facts are not genuinely disputed unless otherwise noted.

the Milford office's District Sales Manager. At all relevant times, Cianciullo reported directly to Odded Benjamin,[3] who was in charge of the Milford office as Area General Sales Manager.

Throughout his tenure at Yellowbook, DeAngelo had multiple successful sales quarters and received various company awards. In 2007, he was promoted to Account Executive, a "performance promotion" for an Account Representative who—after a year or more of experience—has demonstrated that he or she can handle more revenue accounts and make more sales. (Doc. 51 at 14.) An Account Executive is rewarded with a higher base salary, as well as higher commission totals due to increased sales. *Id.*; (Doc. 50 at 206.) Over the course of his five years at the Yellowbook Milford office, DeAngelo received the President's Award, given to top sellers, and the Spirit of Excellence Award, which is "bestowed once a year upon one employee out of the approximately 36 employees" in the Milford office. (Doc. 69 at 1.)

Yet DeAngelo had some unsuccessful quarters. In 2009 he was demoted to Account Representative for poor sales performance. However, he was promoted back to Account Executive in 2010 after meeting his sales quotas. DeAngelo remained an Account Executive until his employment was terminated.

Also in 2009, DeAngelo signed two advertising sales contracts on behalf of his customer, and submitted them for processing.[4] Benjamin told DeAngelo not to sign contracts for customers again but did not issue him a formal warning. (Doc. 50 at 229; Doc. 68 at 34.) Yellowbook claims that Benjamin told DeAngelo in 2009 that he "wanted to fire" him for that conduct. (Doc. 70 at 11.) DeAngelo agrees that Benjamin "told him that he was never to sign a contract again," but disputes that Benjamin said he wanted to fire him. (*Id.* at 12.)

**B.      Contracts and Copy Sheets**

Two forms used by Yellowbook sales employees are relevant to this action. A customer contract is a legally binding document that forms the agreement between the customer and Yellowbook. It includes the advertising service purchased—e.g. print or Internet

---

[3] Benjamin died before DeAngelo commenced this action.

[4] DeAngelo remembers having signed only one contract, but does not dispute Yellowbook's claim that he signed two. DeAngelo states that the customer for whom he signed the contracts was a church at which his brother and sister-in-law worked.

advertisement—as well as the purchase price. (Doc. 50 at 125.) A copy sheet is a form that accompanies a signed contract, and both forms are submitted together for processing. The copy sheet sets forth the advertisement, from which Yellowbook's art department prepares a final proof for customer approval. (Doc. 51 at 137.)

At the time relevant to the complaint, official Yellowbook policy required both the contract and copy sheet to have been signed by the customer in order to be processed. Company policy also prohibited employees from signing a customer's name, even with customer approval. (Doc. 64-5.) However, it is undisputed that if a customer desired to change the advertisement as depicted on the copy sheet it had signed, "the customer could call the sales representative and ask the representative to make a change to the copy sheet without needing to provide an additional customer signature for that change." (Doc. 51 at 137.)

The parties disagree over whether Yellowbook's written policy regarding copy sheets reflected actual company practice. DeAngelo alleges that an unwritten policy permitted sales representatives to sign in place of the customer on the customer signature line of copy sheets. He claims that "[t]he practice of Yellowbook employees signing customer copy sheets was widespread." (Doc. 69 at 9.) DeAngelo highlights the difference between the contract, which constitutes the binding agreement between Yellowbook and its customer, and the copy sheet, which he terms an internal document that may go through many changes without requiring a customer's signature. Yellowbook denies that it was common practice for salespeople to sign copy sheets in place of the customer, and alleges that DeAngelo "knew it was against Yellowbook's policies to sign a copy sheet himself." (Doc. 63 at 5.)

The parties also disagree concerning the nature and the importance of copy sheets to the legitimacy of the sale and the risk to customer relationships. According to Yellowbook, "mistakes in the copy sheets can lead to mistakes in the customer's advertising, and, potentially, disputes with customers." (Doc. 70 at 7.) According to DeAngelo, there is a practical difference between an "initial copy sheet"—which the policy requires the customer to sign along with the contract—and a "proof"—the final version of what was depicted on the initial copy sheet. (Doc. 50 at 125.) DeAngelo claims that the initial copy sheet is a "starting point" for the advertisement (*id.*), which both parties agree is often modified before publication. The "proof" copy sheet, DeAngelo claims, is provided to the customer for final approval (or final modification) before

publication. Yellowbook's art department sends each customer a final proof—which it can either approve or change further—before publication. Yellowbook, however, does not categorize the copy sheets as either "initial" or "proofs."

### C.     DeAngelo's Health Condition

DeAngelo began experiencing health problems in August 2010, and in October of that year he was diagnosed with lymphoma. DeAngelo told Cianciullo and Benjamin about his health condition and treatment plan. DeAngelo's treatment included chemotherapy two to three days per month; blood transfusions; blood tests; and doctors' appointments. Cianciullo and Benjamin allowed DeAngelo to attend doctors' appointments and chemotherapy sessions on workdays without allocating the time missed as sick days or vacation days. DeAngelo did not request leave under FMLA in 2010, and claims that he was unaware he could take FMLA leave "until it was brought to his attention by Human Resources in approximately January 2011." (Doc. 70 at 20.)

As a result of his condition and the side effects of chemotherapy, DeAngelo had difficulty making sales to new businesses during the fourth quarter of 2010. New business sales are sales to new customers; revenue sales are sales to a salesperson's existing clients. The parties agree that revenue sales are generally easier to make than new business sales and that, compared to revenue sales, new business sales were not DeAngelo's strong point. The parties disagree about which type of sale was more profitable to the salesperson. In December 2010, Cianciullo and Benjamin lowered DeAngelo's quarterly quota from twelve to eight new business sales.

DeAngelo failed to meet his modified quota of eight new business sales by the end of the fourth quarter of 2010, which he alleges was due to his health condition and severely inclement weather in late December of 2010. On January 13, 2011, DeAngelo received a "verbal warning," memorialized in writing, for having missed his new business sales quotas in the third and fourth quarters of 2010.[5] Also in January 2011 Cianciullo placed DeAngelo on a "performance improvement plan" which allowed him to sell only to new businesses and not to

---

[5] The warning states that DeAngelo did not meet his quotas in the *first* and fourth quarters of 2010, but Yellowbook agrees that it should read "third and fourth quarters of 2010."

any of his existing, or revenue, clients. The plan also required DeAngelo to make seven new business sales by the end of January, a deadline later extended to mid-February.

The parties also disagree about the reasonableness of the requirement that DeAngelo make seven new business sales within roughly one month. The unmodified new business sales quota for Yellowbook Account Representatives and Executives at the time relevant to the complaint was twelve per quarter, averaging four new business sales per month, or one new business sale per week. DeAngelo argues that, because his modified quota required him to make almost double the new business sales required of healthy sales representatives, "Cianciullo's actions in January 2011 were designed to set [him up] to fail." (Doc. 68 at 10.) Yellowbook disputes DeAngelo's characterization of his new business sales quota under the performance improvement plan as unrealistic.

The parties also disagree about the status of DeAngelo's health in January 2011. By this time the results of a December 28, 2010 PET scan had revealed "complete metabolic resolution." (Doc. 63 at 3.) Yellowbook claims that DeAngelo told Cianciullo in January 2011 that "his cancer had been successfully treated." (*Id.*) DeAngelo maintains that in addition to the news that his lymphoma had been successfully treated, he told his supervisors that he "had good days and bad days," and that he was still receiving chemotherapy treatments. (Doc. 70 at 5.)

DeAngelo alleges that his health condition as well as more snow storms hindered his ability to make new sales in January. DeAngelo states that the pressure to make sales combined with his ongoing health condition caused him to contact Bri Carson, a Yellowbook human resources ("HR") representative, with whom he discussed options for taking FMLA leave. DeAngelo claims that on the morning of February 22, 2011 he informed Carson by email that he wanted to take leave under FMLA after having conferred with his doctor, and on the same day he faxed her a letter from his doctor in support of his request. Neither Benjamin nor Cianciullo were copied on DeAngelo's email to Carson.

### D.     DeAngelo's Termination

On February 22, 2011—the same day DeAngelo formally requested leave pursuant to the FMLA from Carson—Cianciullo, in the presence of Benjamin, confronted DeAngelo about certain copy sheets that he had submitted for new business sales. DeAngelo admitted that he

himself—rather than the customer—provided a signature on the customer signature line of the four copy sheets at issue.  DeAngelo was terminated later that day for the stated reason of fraudulently signing copy sheets.[6]

The timeline of the events on February 22 is disputed.  The parties agree that DeAngelo was called into either Cianciullo's or Benjamin's office for a meeting with both of them twice that day—the first in which they confronted him concerning his signatures on the four copy sheets, and a second time in which he was discharged from employment.  DeAngelo claims that he informed Cianciullo and Benjamin during the first meeting that he had requested leave under the FMLA with HR.  He claims that he "showed his supervisors the FMLA letter from his doctor.  He told them: 'I have a leave of absence letter from my doctor and I'll be taking FMLA.'"  (Doc. 68 at 18.)  DeAngelo claims that Cianciullo and Benjamin "simply told [him] that he would have to speak to Human Resources about that."  (*Id.*)

Yellowbook alleges that neither supervisor was aware that DeAngelo had requested FMLA leave until the following day, February 23, when Benjamin and Cianciullo received an "automated email from Yellowbook's benefits department" listing DeAngelo as an employee who had recently requested FMLA leave.  (Doc. 70 at 23.)   DeAngelo alleges that his former supervisors did not receive the email automatically; rather, he claims that the automated email was forwarded to Benjamin, "[a]s requested," by another Yellowbook employee, "suggesting Mr. Benjamin asked to receive it."  (*Id.*)

The parties also disagree about Cianciullo's role in DeAngelo's termination.  Yellowbook claims that Benjamin alone made the decision to discharge DeAngelo and in fact discharged him.  DeAngelo concedes that Benjamin decided to and did terminate his employment, but alleges that he did so upon the recommendation of Cianciullo, whose opinion Benjamin valued.[7]

---

[6]  DeAngelo challenges Cianciullo's assumption at the time of DeAngelo's termination that he "forged" the customer signatures on the copy sheets; DeAngelo signed his own name on the customer signature lines, and not the customers' names.  It is undisputed that DeAngelo signed his own name to the four copy sheets at issue.

[7]  In his response to Yellowbook's Local Rule 56(a)(1) statement, DeAngelo objects, on hearsay grounds, to the testimony of Cianciullo and a Yellowbook HR representative that "Benjamin made the termination decision."  (Doc. 70 at 13-14.)  However, DeAngelo does not argue

Finally, DeAngelo claims that the reason Yellowbook gave for his termination—fraudulently signing copy sheets—is pretextual, and that he was actually terminated because of his disabling health condition and because he requested leave under the FMLA. Yellowbook denies that its reason for firing DeAngelo was pretext for discrimination or that Benjamin knew DeAngelo had requested leave, let alone discharged him because of the request.

## II.     Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party asserting that a fact is genuinely disputed must cite to "particular parts of materials in the record, including[,] [*inter alia,*] depositions." Fed. R. Civ. P. 56(c)(1). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012).

The burden is on the moving party to show that it is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The non-moving party receives the benefit of favorable inferences drawn from the underlying facts. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). However, allegations that are "conclusory and unsupported by evidence of any weight" are insufficient for the non-moving party to withstand a

---

otherwise in his opposition memorandum, and the court does not consider the fact that Benjamin decided to terminate DeAngelo to be in genuine dispute. The parties' real disagreement centers on Cianciullo's role in the decision-making process and on the discriminatory intent (or absence thereof) of both potential decision-makers.

This objection is but one of eleven hearsay objections DeAngelo records in his response to Yellowbook's statement of facts. While "it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997), the court has concluded that it need not resolve these objections in ruling on this motion. *See Martin v. Nat'l R.R. Passenger Corp.*, No. 10 Civ. 4199(CM), 2012 WL 826597, at *1 (S.D.N.Y. Mar. 9, 2012) (denying summary judgment and preserving argument and ruling on evidentiary objections for pre-trial conference).

motion for summary judgment. *Smith v. Am. Express Co.*, 853 F.2d 151, 155 (2d Cir. 1988). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

## III.   Analysis and Conclusions

### A.   The ADA Claim

DeAngelo argues that he suffered an adverse employment action because of his disability in violation of the Americans with Disabilities Act. (Doc. 27 at 7-8.) The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This claim is evaluated under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 741 (2d Cir. 2014). Under the *McDonnell Douglas* rubric, the plaintiff "must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

### i.   DeAngelo's Prima Facie Case

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista*, 445 F.3d at 169. Establishing a prima facie case "is not a demanding

8

burden." *Hopkins v. New England Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 252 (D. Conn. 2013) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998)).

It is undisputed that Yellowbook was subject to the ADA at all times relevant to the complaint. The second element requires DeAngelo to show he was disabled under the ADA. The ADA, as amended by the ADA Amendment Act of 2008,[8] defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). DeAngelo claims that he had an "'actual' disability" under § 12102(1)(A)—namely, cancer. (Doc. 27 at 7.)

A medical diagnosis alone does not necessarily demonstrate that a plaintiff had an impairment under the ADA. "[R]ather, the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." *Thomsen v. Stantec, Inc.*, 785 F. Supp. 2d 20, 22 (W.D.N.Y. 2011), *aff'd* 483 F. App'x 620 (2d Cir. 2012) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002) (internal modifications omitted)). Moreover, "[a] disability under the ADA does not include temporary medical conditions, even if those conditions require extended leaves of absence from work because such conditions are not substantially limiting." *Id.* (internal quotation omitted). However, "'[s]ubstantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

DeAngelo's medical records indicate that he was diagnosed with the cancer lymphoma; underwent chemotherapy sessions between October 2010 and February 2011; and underwent blood transfusions. DeAngelo claims that he lost approximately thirty pounds, "his skin turned gray, and the chemotherapy treatments left him weak, lethargic, and short of breath." (Doc. 69 at 2.) The sworn testimony of a Yellowbook employee corroborates DeAngelo's claim. (Doc. 68 at 5.) Yellowbook argues that DeAngelo's "cancer was successfully treated over a three month period, which may be insufficient to render it a disability under the ADA." (Doc. 62 at 9 n.3.)

---

[8] The ADA Amendment Act of 2008 broadened the definition of "disability" under the ADA, most notably by "set[ting] out a more lenient standard for determining whether an individual is regarded as disabled under the ADA." *Sherman v. Cnty. of Suffolk*, No. 11-cv-2528 (ADS)(SIL), 2014 WL 7370033, at *9 (E.D.N.Y. Dec. 29, 2014).

However, DeAngelo produces evidence that he continued to undergo chemotherapy in January and February 2011. It is common knowledge, as this court acknowledged at the hearing on DeAngelo's motion for a prejudgment remedy, that chemotherapy causes severe negative side effects on cancer patients. (Doc. 51 at 201–02.) Additionally, DeAngelo has produced evidence that his doctor suspected in 2012 that he had recurrent lymphoma. (Doc. 71-23 at 4.) Whether DeAngelo was disabled within the meaning of the ADA during the time relevant to the complaint presents disputed issues of material fact. *See Mark v. Burke Rehab. Hosp.*, No. 94 Civ. 3596 RLC, 1997 WL 189124, at *3 (S.D.N.Y. Apr. 17, 1997) (concluding plaintiff had "sufficiently shown that he [was] 'disabled' as a former cancer patient under the ADA" despite fact that his cancer was in remission when employer terminated his employment).

The third element of the prima facie case for discrimination requires DeAngelo to show that he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation. "A plaintiff's burden of showing that he can perform the essential functions of his job with a reasonable accommodation is not a heavy one." *Mark*, 1997 WL 189124, at *5 (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). "A plaintiff only needs to demonstrate that he possesses the basic skills necessary for performance of the job." *Colby v. Pye & Hogan LLC*, 602 F. Supp. 2d 365, 371 (D. Conn. 2009) (internal modifications omitted). DeAngelo alleges that he could perform the essential functions required of his job with reasonable accommodation. (Doc. 27 at 7–8.) He has also demonstrated that he possesses the basic skills necessary to sell advertisements to existing and prospective Yellowbook customers. Yellowbook does not argue that DeAngelo was not qualified for the job. DeAngelo has therefore made a prima facie showing that he was qualified within the meaning of the ADA.

Finally, DeAngelo must make a prima facie showing that he suffered adverse employment action because of his disability. As a threshold matter, the parties disagree as to what level of causation DeAngelo must show. DeAngelo argues that he need only show that his disability was a "motivating factor" in Yellowbook's decision to terminate his employment. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir. 2000) (holding that a plaintiff alleging disability discrimination under the ADA "must show only that disability played a motivating role in the decision"). Yellowbook contends that following the Supreme Court's

holdings in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013), that plaintiffs asserting discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and retaliation in violation of Title VII must show "but-for" causation, the same "but-for" causation standard should apply to claims under the ADA. A "but-for" causation standard requires a plaintiff to show that, but for his disability, his employer would not have inflicted the adverse employment action; however, a plaintiff need not establish that discrimination was the sole reason for the employer's action. *See Saviano v. Town of Westport*, No. 3:04-CV-522(RNC), 2011 WL 4561184, at *6 (D. Conn. Sept. 30, 2011).

Whether to extend the holdings in *Gross* and *Nassar* to discrimination claims under the ADA is an "open question in this circuit," *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-CV-243 (JFB)(WDW), 2014 WL 3867560, at *14 n.12 (E.D.N.Y. July 29, 2014), and one already well considered by the district courts within it. *See, e.g., Sherman*, 2014 WL 7370033, at *12-14. While some district courts have concluded that the ADA requires a plaintiff to show but-for causation, *see, e.g., Saviano*, 2011 WL 4561184, at *6, "[o]thers have preferred to treat *Parker* as binding absent a conclusive pronouncement by the Second Circuit or the Supreme Court and have continued to apply mixed-motives analysis under the ADA." *Lyman v. New York & Presbyterian Hosp.*, No. 11 Civ. 3889(KPF), 2014 WL 3417394, at *10 (S.D.N.Y. July 14, 2014) (citing *Widomski v. State Univ. of New York (SUNY) at Orange*, 933 F. Supp. 2d 534, 546 n.9 (S.D.N.Y. 2013)); *see also Kaufman v. Columbia Mem'l Hosp.*, No. 1:11-CV-667 (MAD/DRH), 2014 WL 652886 (N.D.N.Y. Feb. 19, 2014), *reconsideration denied*, No. 1:11-CV-667 (MAD/CFH), 2014 WL 2776662 (N.D.N.Y. June 19, 2014) ("[T]he *Gross* 'but-for' standard does not apply to the ADA . . . disability discrimination claim[].").

The court need not determine on summary judgment which causation standard applies because there is a genuine dispute of material fact whether DeAngelo was terminated on the basis of his disability under either standard. *See Sherman*, 2014 WL 7370033, at *15 ("Having found that Plaintiff has established a genuine issue of material fact under either the 'motivating factor' or 'but for' standard of causation, at this juncture of the litigation, the resolution of the proper level of causation required for an ADA claim is not necessary."). DeAngelo has produced evidence showing that at least some other Yellowbook employees believed the official

policy regarding the signing of copy sheets was not strictly enforced, and two other Yellowbook employees stated under oath that Cianciullo engaged in the technically forbidden practice himself.  Because it calls into question Yellowbook's purported reason for firing DeAngelo—and because Yellowbook offers no alternative reason for his termination—such evidence is sufficient to create a genuine factual issue about whether DeAngelo has met his minimal burden of making a prima facie case of discrimination, even under a "but-for" causation standard.  *See Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) ("[T]he burden of making out a prima facie case is not onerous . . . ." (internal quotation omitted)).

### ii.    Yellowbook's Legitimate, Non-Discriminatory Reason for DeAngelo's Discharge

Upon DeAngelo's prima facie showing of disability discrimination, the burden shifts to Yellowbook to offer a legitimate, non-discriminatory reason for terminating DeAngelo's employment.  Yellowbook has produced the written workplace policies in place at the time DeAngelo signed the four copy sheets.  Yellowbook's Ethical and Procedural Standards for Customer Accounts—a copy of which DeAngelo signed—directed: "Once completed, all copy sheets require a customer signature . . . ."  (Doc. 64-5 at 3.)  The Ethical and Procedural Standards also stated: "[V]iolations or patterns of behavior not in accordance with these guidelines may result in disciplinary action up to and including termination of employment." (*Id.*)  Additionally, Yellowbook's Policy and Procedure Manual provided:

> Due to the legalities involved, signing another person's name is considered forgery, even with the customer's verbal approval, regardless of the situation. . . . A customer should always approve copy prior to being submitted into the system . . . . Having the customer signature on the completed copy sheet also assists us in dealing with any possible future customer service claims or issues. . . . Failure to comply with these standards could result in loss of commission, probation, or even loss of employment. While a violation may not be intentional, you are still accountable for your actions . . . .

(Doc. 64-6 at 3-4.)

Yellowbook claims that it terminated DeAngelo's employment after he signed his own name on the customer signature line of four copy sheets he submitted for processing.  (Doc. 62 at 11.)  DeAngelo admits that Yellowbook's written policies forbid this behavior and that he engaged in it.  (Doc. 70 at 8, 12.)  But DeAngelo denies that Yellowbook's policies "made clear

that any falsification of records, including copy sheets, is grounds for discipline, up to and including termination." (*Id.* at 9.)  However, as excerpted above, the policies provided both that copy sheets needed customer signatures and that non-compliance could result in termination of employment.  There is thus no genuine dispute that Yellowbook's written policies entitled it to discharge an employee for signing his own name to copy sheets.

Yellowbook's evidence that DeAngelo's conduct violated its written policies and that such behavior could result in termination of employment under the policies is sufficient to fulfill its burden of articulating a legitimate, non-discriminatory reason for DeAngelo's discharge.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (holding employer's proffer of a neutral policy against rehiring employees previously terminated for violating workplace conduct rules "satisfied its obligation under *McDonnell Douglas* to provide a legitimate, non-discriminatory reason for refusing to rehire respondent").

### iii.    DeAngelo's Evidence that Yellowbook's Proffered Reason for Terminating His Employment is Pretext for Discrimination

DeAngelo bears the burden under the *McDonnell Douglas* rubric of showing, by a preponderance of the evidence, that Yellowbook's proffered reason for his termination was a pretext for discrimination.  *Saviano*, 2011 WL 4561184, at *6.  DeAngelo may rely on the same evidence as established in his prima facie case to demonstrate pretext.  *Koontz v. Great Neck Union Free Sch. Dist.,* No. 12-CV-2538 (PKC), 2014 WL 2197084, at *4 (E.D.N.Y. May 27, 2014).  DeAngelo may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Bombero v. Warner-Lambert Co.,* 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000).

DeAngelo marshals ample evidence supporting his allegation that Yellowbook policy concerning the signing of copy sheets by sales representatives was more lenient in practice than on paper.  DeAngelo produces sworn testimony from three Yellowbook employee witnesses suggesting that Yellowbook not only tolerated its employees signing copy sheets, but also that many employees engaged, at least on occasion, in the technically forbidden behavior.  For example, Michael Brereton, a former Account Representative at the Yellowbook Milford office,

testified: "I've seen managers sign copy sheets. I've seen everyone sign them. I had no idea it was the policy [that 'the copy sheet should be filled out in full in the presence of the customer']." (Doc. 71-17 at 50) (Brereton Dep. Trans.) Former Sales Manager Nancy Montgomery stated: "Back in the day when Jim [DeAngelo] was there . . . we were doing it, where you'd put the customer's name and you'd put your initials next to it. . . . It was just like an understanding." (Doc. 71-18 at 43-44) (Montgomery Dep. Trans.)[9]

Yellowbook disputes the allegation that it tolerated employees signing copy sheets. Resolving this dispute would thus require determining the credibility of witnesses. "On a motion for summary judgment, district courts simply '*may not* make credibility determinations.'" *Desia v. GE Life & Annuity Assur. Co.*, No. 3:05 CV 1395(MRK), 2008 WL 4724080, at *6 (D. Conn. Oct. 24, 2008) (quoting *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 118 (2d Cir. 2006)) (internal modifications omitted). Because the credibility of a witness's testimony is an inappropriate determination for the court to make at the summary judgment stage, this factual dispute warrants denying summary judgment.

DeAngelo also produces evidence that, approximately one month after his employment was terminated, Yellowbook held an office-wide meeting "in which it discussed that the signing of copy sheets would no longer be allowed." (Doc. 69 at 11.) Yellowbook disputes the characterization of the meeting as informing that signing copy sheets for customers would "no longer" be allowed; rather, it claims that the meeting reaffirmed existing company policy. However, DeAngelo supports his interpretation of the meeting with the sworn testimony of an employee witness in attendance. (Doc. 71-18 at 45.) If believed, DeAngelo's characterization of the meeting supports his allegation that an unofficial policy at the time of his termination tolerated employees signing copy sheets.

DeAngelo also alleges that Cianciullo himself signed copy sheets on at least two

---

[9] At the March 27, 2015 hearing on the motion for summary judgment, Yellowbook argued that the above quotes from the former Yellowbook employees' depositions were taken out of context. Yellowbook contends that a more holistic reading of the employees' depositions indicates both that the practice of employees signing copy sheets was rare, and that in any case it was not acceptable for an employee to sign an initial copy sheet. However, a reasonable juror could infer from the deposition testimony—which includes the statements quoted above—that Yellowbook employees in fact signed copy sheets themselves and that this practice was permitted.

occasions. Yellowbook disputes this allegation, and offers in rebuttal Cianciullo's testimony that he has never done so. DeAngelo offers the sworn testimony of two Yellowbook employee witnesses that Cianciullo did sign copy sheets. (Doc. 69 at 9.) Again, witness credibility determinations are the jury's to make.

DeAngelo also points to the lack of evidence that Yellowbook disciplined other employees for engaging in identical or similar behavior. First, DeAngelo points to the evidence that he himself signed two customer contracts in 2009—conduct likewise against official Yellowbook policy, but for which he did not even receive a warning, let alone employment termination. DeAngelo further notes that despite Yellowbook's claim that "other individuals in the Milford office have been terminated in the five years preceding [DeAngelo]'s termination for falsification of documents," "Yellowbook cannot point to a single employee it has ever terminated for just signing copy sheets." (Doc. 70 at 10.) A reasonable jury may consider this evidence sufficient to find that the articulated reason for DeAngelo's termination was pretextual. *See Sherman*, 2014 WL 7370033, at *16 (noting that witness's testimony that "no Corrections Officer with comparable evaluation scores had been terminated on that basis" supported plaintiff's argument that evaluations were pretext for discrimination).

DeAngelo has thus produced sufficient admissible evidence from which a reasonable factfinder could conclude that Yellowbook's purported reason for terminating DeAngelo's employment was pretextual. *See Berube v. Great Atl. & Pac. Tea Co., Inc.*, No. 3:06-cv-00197 (VLB), 2010 WL 3021522, at *7 (D. Conn. July 29, 2010) (concluding that plaintiff produced sufficient evidence to show pretext where he was purportedly terminated for not following inventory procedures of which he was unaware). Such evidence alone may be sufficient to fulfill DeAngelo's burden under the third and final step of the *McDonnell Douglas* rubric. *See Reeves*, 530 U.S. at 147 ("It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . . Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

DeAngelo nonetheless has produced evidence to support his argument that Yellowbook's proffered reason was not only pretextual, but also that it was pretext for discrimination. Discriminatory intent can be inferred from "the historical background of the decision" and from

"the specific sequence of events leading up to the challenged decision." *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002). DeAngelo points to his performance improvement plan's requirement that he make nearly double the number of new business sales within roughly a one-month period as that required of healthy sales representatives. (Doc. 69 at 5.) A factfinder could find Yellowbook's stated reason for the relatively high sales quota it imposed on DeAngelo in January 2011—"focus[ing] on making only new business sales"—illogical, and could consequently infer an intent on the part of Yellowbook's management to discriminate against DeAngelo on the basis of his disability. (Doc. 70 at 19); *see Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 880 n.6 (2d Cir. 1997) ("Actions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate."). DeAngelo has also produced text messages between Cianciullo and himself in which Cianciullo pushes him to make sales and refers to a blizzard and a doctor's visit as "[e]xcuses." (Doc. 71-9 at 3.) The Second Circuit has instructed that, "where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate" in an employment discrimination case. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).

Regarding the decision to terminate his employment, the undisputed facts alone constitute evidence from which a jury could infer that Cianciullo influenced Yellowbook's decision to terminate his employment. Cianciullo admits that he was in the office with Benjamin when the decision to discharge DeAngelo was made; that Benjamin valued Cianciullo's input; and that Cianciullo "probably" recommended to Benjamin that he terminate DeAngelo's employment. (Doc. 69 at 14; Doc. 51 at 165-66.) The evidence supports a "cat's paw" theory of discrimination, in which "a nondecisionmaker with a discriminatory motive dupes an innocent decisionmaker into taking action against the plaintiff." *Saviano*, 2011 WL 4561184, at *7.

DeAngelo has produced evidence from which a reasonable jury could conclude that his employment would not have been terminated on February 22, 2011 but for his disabling health condition. Additionally, DeAngelo demonstrates multiple genuine issues of material fact. In a "classic he-said/she-said [case], which involves an assessment of the credibility of witnesses and the resolution of competing inferences that can be drawn from disputed facts," summary judgment is not appropriate. *Hopkins*, 985 F. Supp. 2d at 253. Yellowbook's motion for

16

summary judgment on DeAngelo's ADA discrimination claim is denied.

**B.    The CFEPA Claim**

DeAngelo also alleges that Yellowbook's actions violated the Connecticut Fair Employment Practices Act. The CFEPA makes it unlawful for an employer to discharge from employment an individual "because of" the individual's physical disability. C.G.S.A. § 46a-60(a)(1). Other than the CFEPA's broader definition of disability, "[c]laims under the CFEPA are analyzed using the same burden shifting framework set forth by the Supreme Court in *McDonnell Douglas* for use in Title VII, ADA, and ADEA cases." *Berube*, 2010 WL 3021522, at *9; *see also Hopkins*, 985 F. Supp. 2d at 256 ("The only relevant difference between the analysis a court undertakes in regards to ADA and CFEPA claims is in defining physical disability.").

Yellowbook argues that DeAngelo was not physically disabled within the meaning of the CFEPA. (Doc. 62 at 12.) A plaintiff is physically disabled under the CFEPA if he has "any chronic handicap, infirmity, or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." *Id.* § 46a-51(15). "This definition is significantly broader than that of the ADA because it does not require that the chronic impairment substantially limit a major life activity." *Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 88 (D. Conn. 2006) (citing *Beason v. United Techs. Corp.*, 337 F.3d 271, 277-78 (2d Cir. 2003)). Because the court has concluded there is a genuine issue of fact whether DeAngelo was disabled under the ADA at the time he was discharged, it necessarily concludes that the same issue of fact exists regarding whether he was disabled under the CFEPA. *See Stoffan v. S. New England Tel. Co.*, 4 F. Supp. 3d 364, 373 (D. Conn. 2014); *Dzubaty v. Milford Bd. of Educ.*, No. CV065000824S, 2007 WL 2570413, at *3 (Conn. Super. Ct. Aug. 20, 2007) ("The Second Circuit has held that the ADA has an additional requirement that is absent from the CFEPA definition.") (quoting *Beason*, 337 F. 3d at 275).

The debate over what standard of causation a plaintiff is required to show reappears within the context of DeAngelo's CFEPA claim. The arguments on either side are the same as those discussed above regarding the ADA causation standard, with the addition of federalism

concerns about a federal court determining state law standards. *See Johnson v. Manson*, 493 A.2d 846, 852 (Conn. 1985) ("Connecticut is the final arbiter of its own laws."). Yellowbook argues that DeAngelo must show that his employment would not have been terminated but for his disability. Yellowbook starts from the premise, discussed above, that the "but-for" causation standard now applies to the ADA. Because "Connecticut courts review[] federal precedent concerning employment discrimination for guidance in enforcing the CFEPA," *Young v. Precision Metal Prods., Inc.*, 599 F. Supp. 2d 216, 228 (D. Conn. 2009), Yellowbook contends that the CFEPA also requires that a disability discrimination plaintiff show "but-for" causation. (Doc. 62 at 14-17.)[10]

Whether the *Gross* and *Nassar* holdings affect the causation standard of claims under the CFEPA has not been determined by the Connecticut Supreme Court, and the federal courts in this district have not agreed upon a resolution of their own. *Compare Tremalio v. Demand Shoes, LLC*, No. 3:12-CV-00357 (VLB), 2013 WL 5445258, at *21 (D. Conn. Sept. 30, 2013) (concluding that "this Court has previously held that until Connecticut courts adopt a new standard, it will follow existing Connecticut Supreme Court pronouncements on the appropriate standard to employ in applying Connecticut law and apply a contributing or motivating factor analysis to CFEPA claims," and citing cases), *with Marini v. Costco Wholesale Corp.*, No. 3:11-cv-00331 (JAM), 2014 WL 6772287, at *11 n.5 (D. Conn. Dec. 1, 2014) (noting the "uncertainty whether a retaliation claim under the ADA or parallel provision of CFEPA should be governed by a 'motivating factor' standard rather than a 'but-for' causation standard," and declining to decide the issue).

However, the court need not determine at the summary judgment stage which standard of causation applies to disability discrimination claims under the CFEPA. DeAngelo has produced sufficient evidence to survive Yellowbook's motion for summary judgment, under either

---

[10] At the March 27 hearing, Yellowbook cited recent case law in which District of Connecticut and Second Circuit courts applied "but-for" causation to employment discrimination claims alleging, *inter alia*, age discrimination in violation of the CFEPA. This case law does not persuade the court to apply a "but-for" causation standard to a CFEPA claim alleging *disability* discrimination; while *Gross* made clear the causation standard applicable to ADEA claims, the standard under the ADA is still unclear. *See Wesley-Dickson*, 586 F. App'x at 745 n.3 (noting that the "but-for" standard "might apply" to plaintiff's ADA claim but declining to decide the question because plaintiff failed to satisfy either standard).

standard, for the same reasons that his ADA claim withstands summary judgment: his evidence that Yellowbook's official policy against sales representatives signing copy sheets was not consistently enforced; that Cianciullo himself signed copy sheets; and that his performance improvement plan required him to make significantly more new business sales than healthy salespeople. The evidence demonstrates the presence of genuine issues of material fact about whether he would not have been discharged but for his disability and whether Yellowbook's purported reason for terminating him was pretext for disability discrimination. *See Hopkins*, 985 F. Supp. 2d at 256 ("With regard to the CFEPA discriminatory and retaliation claims that relate to Hopkins' disability, the claims should survive summary judgment for the same reasons that the ADA discrimination and retaliation claims survived summary judgment."). Yellowbook's motion for summary judgment on DeAngelo's CFEPA claim is denied.

### C.    The FMLA Claims

DeAngelo alleges that Yellowbook violated his rights under the Family and Medical Leave Act. (Doc. 27 at 8-9.) The FMLA entitles eligible employees "to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C.A. § 2612(a)(1). The Second Circuit has recognized two causes of action—"interference" and "retaliation"—under the FMLA. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). A plaintiff may assert both claims. *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 198 (2d Cir. 2009).

### i.    FMLA Interference Claim

DeAngelo alleges that Yellowbook interfered with the exercise of his rights under the FMLA. (Doc. 27 at 8.) The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an eligible employee's rights under the FMLA. 29 U.S.C.A. § 2615(a)(1). "Substantive rights under the FMLA subject to interference claims include the right to take leave, receive benefits during leave and be restored to the same or equivalent position following leave." *Gauthier v. Yardney Technical Prods., Inc.*, No. 3:05-cv-1362(VLB), 2007 WL 2688854, at *4 (D. Conn. Sept. 13, 2007). A Department of Labor regulation explains that "'[i]nterfering with' the exercise of an employee's

rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). While the Second Circuit has yet to set forth a standard to apply to FMLA interference claims,

> [t]he weight of authority in the Circuit . . . holds that in order to establish a prima facie case of interference in violation of the FMLA a plaintiff must show that: (1) [H]e is an "eligible employee" under the FLMA; (2) that [the employer] is an employer as defined in [the] FMLA; (3) that [he] was entitled to leave under [the] FMLA; (4) that [he] gave notice to [the employer] of [his] intention to take leave; (5) that [he] was denied benefits to which []he was entitled under [the] FMLA.

*Ridgeway v. Royal Bank of Scotland Grp.*, No. 3:11-cv-976 (VLB), 2012 WL 1033532, at *6 (D. Conn. Mar. 27, 2012); *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 205 (D. Conn. 2012). The alleged interference must ultimately result in a denial of a benefit under the FMLA. *Ridgeway*, 2012 WL 1033532, at *7. DeAngelo claims that Yellowbook interfered with the exercise of his right to take FMLA leave by terminating his employment before he could do so. (Doc. 27 at 8-9.)

Yellowbook does not dispute that DeAngelo meets the first four elements of his FMLA interference claim. Yellowbook argues that DeAngelo cannot establish the fifth element of his FMLA interference claim—"that he was denied leave to which he was entitled." (Doc. 62 at 22.) Yellowbook claims that DeAngelo would have been terminated regardless whether he requested FMLA leave because he "falsified copy sheets." (*Id.* at 24.) Because taking FMLA leave does not create an absolute entitlement to an employment position, *see* 29 U.S.C.A. § 2614(a)(3)(B), DeAngelo's position was not immune from termination for disciplinary reasons merely because he requested leave. DeAngelo responds with the same argument he makes under his ADA and CFEPA claims: that the reason for his termination was pretextual and that a jury could find "that, had Mr. DeAngelo not sought FMLA leave, Yellowbook would not have terminated him." (Doc. 68 at 37.) For the reasons discussed in connection with DeAngelo's ADA and CFEPA claims, a reasonable jury could conclude that Yellowbook's purported reason for terminating DeAngelo's employment was a pretext for discrimination.

While the employer's "subjective intent is not an issue" in FMLA interference claims, *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 69 (D. Conn. 2014), a plaintiff alleging a FMLA interference claim still "must show that the defendant considered the plaintiff's

FMLA leave a negative factor in its decision to terminate him." *Bowman v. CSX Transp., Inc.*, 22 F. Supp. 3d 181, 190 (N.D.N.Y. 2014) (quoting *Sista*, 445 F.3d at 175-76 (internal modifications omitted)). DeAngelo has produced evidence, discussed below, from which a reasonable factfinder could infer that Yellowbook considered his request for leave a negative factor when Yellowbook terminated his employment. Therefore, DeAngelo has produced evidence from which a jury could infer that Yellowbook interfered with the exercise of his right to FMLA leave by terminating his employment. *See Santiago v. Dep't of Transp.*, No. 3:12cv132 (JBA), 2014 WL 4823869, at *12 (D. Conn. Sept. 25, 2014) ("Threatening an employee with termination for requesting leave under the FMLA can constitute interference . . . ."). Summary judgment on DeAngelo's FMLA interference claim is DENIED.

### ii.     FMLA Retaliation Claim

DeAngelo's final claim against Yellowbook is retaliation in violation of the FMLA. FMLA retaliation claims are also analyzed under the familiar *McDonnell Douglas* burden-shifting rubric. *Roberts v. Health Ass'n*, 308 F. App'x 568, 570 (2d Cir. 2009). To make a prima facie showing of retaliation, DeAngelo must establish: (1) he exercised his rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.* Upon a successful prima facie case, the burden shifts to Yellowbook to proffer a legitimate, non-discriminatory reason for the adverse employment action. If Yellowbook meets this burden, then DeAngelo must demonstrate that Yellowbook's purported reason was pretext for retaliation for filing for FMLA leave. *See Potenza*, 365 F.3d at 168.

Yellowbook argues that DeAngelo cannot meet the fourth element of his prima facie case—that his discharge occurred under circumstances giving rise to retaliatory intent—because he has produced no evidence that Benjamin, "the decision maker, had the requisite knowledge of [DeAngelo's] request for FMLA leave." (Doc. 62 at 26.) A lack of evidence from which a jury could infer that a plaintiff's supervisor knew that he had requested FMLA leave is "fatal" to his retaliation claim. *Housel v. Rochester Inst. of Tech.*, No. 10-CV-6222FPG, 2014 WL 1056576 (W.D.N.Y. Mar. 17, 2014). DeAngelo, however, has produced such evidence.

It is undisputed that DeAngelo requested FMLA leave at 7:28 am on February 22, 2011, before his first meeting with Benjamin and Cianciullo later that morning, and before he was discharged. (Doc. 70 at 22.) DeAngelo produces two pieces of evidence from which a jury could infer that Benjamin was aware that DeAngelo had requested FMLA leave when Benjamin made the decision to terminate DeAngelo's employment. First, DeAngelo testified that, prior to the termination, he showed Mr. Benjamin and Mr. Cianciullo the letter from his doctor supporting his request for FMLA leave and told them: "I have a leave of absence letter from my doctor and I'll be taking FMLA." (Doc. 50 at 225; Doc. 68 at 38.) Because for purposes of this motion all inferences are granted in DeAngelo's favor, the court must accept his testimony as true when it is based on his own observations. *See Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 283 (D. Conn. 2008).

Second, DeAngelo points to an email chain attached as an exhibit to Yellowbook's motion, dated February 23, 2011. (Doc. 64-13.) The first email in the chain is what Yellowbook terms an "automated email noting DeAngelo's FMLA request," time-stamped at 8:06 am on February 23. (*Id.* at 4; Doc. 62 at 27.) Benjamin is not copied on the initial email in the chain, in which DeAngelo is listed as having a leave "[e]ffective [d]ate" of February 23, 2011. (Doc. 64-13 at 4.) Two forwards of the email landed it in Benjamin's inbox at 8:58 am the same day, with the sole prefatory language: "As requested." (*Id.* at 3.) DeAngelo contends that this language implies that Benjamin "had 'requested' the email confirming DeAngelo's leave request, thus suggesting that he knew about the request before he received the email." (Doc. 68 at 38.) Granting the inference in DeAngelo's favor, a reasonable jury could conclude that Benjamin knew about DeAngelo's leave request at some point before he received the February 23 email. Whether Benjamin knew of DeAngelo's FMLA leave request at the time he decided to discharge him is thus genuinely disputed, and summary judgment cannot be granted in Yellowbook's favor on this point.

The parties do not discuss in their memoranda whether Yellowbook has met its burden under the second step of the *McDonnell Douglas* test. However, the court concludes that Yellowbook has proffered a legitimate, non-discriminatory reason for DeAngelo's discharge—signing copy sheets against company policy—for the reasons discussed above in connection with DeAngelo's ADA claim.

Finally, DeAngelo must show that Yellowbook's proffered reason for terminating DeAngelo's employment was pretext for retaliation against him for having requested FMLA leave. Again, the parties disagree on the appropriate causation standard a plaintiff alleging FMLA retaliation must show. (Doc. 62 at 7; Doc. 68 at 39-40.) The Second Circuit has not addressed the impact, if any, of *Gross* and *Nassar* on FMLA retaliation claims. *See Wanamaker*, 11 F. Supp. 3d at 73.

The court need not determine the appropriate causation standard, however, because DeAngelo has produced evidence from which a reasonable jury could infer that Yellowbook's stated reason for terminating his employment was pretextual. *See Slade v. Alfred Univ.*, No. 11-CV-396, 2013 WL 6081710, at *2 (W.D.N.Y. Nov. 19, 2013) (declining to reach the causation standard determination because, "[e]ven when th[e] Court analyze[d] plaintiff's claims using the 'but for' standard suggested by defendant, it [found] that there remain[ed] a triable issue of fact as to whether plaintiff was terminated in retaliation for taking FMLA qualifying leave").

DeAngelo points to the close temporal proximity between his request for leave and his discharge as evidence that the latter event was retaliation for the former. Yellowbook correctly points out that, "without more, such temporal proximity is insufficient" to create a triable issue of fact as to pretext. *Simpson v. N.Y. State Dep't of Civil Servs.*, 166 F. App'x 499, 502 (2d Cir. 2006). However, as discussed above in connection with his ADA claim, DeAngelo has produced evidence—specifically, evidence of inconsistent enforcement of official Yellowbook policy and evidence that DeAngelo was assigned a particularly demanding new business sales quota—that Yellowbook's purported reason for discharging him may have been pretextual.

The temporal proximity of DeAngelo's request for FMLA leave and his termination from employment, coupled with evidence from which a factfinder could infer that Yellowbook's purported reason for discharging DeAngelo was pretextual, present a genuine issue of fact whether—but for DeAngelo's leave request—Yellowbook would have discharged him from employment. *See Slade*, 2013 WL 6081710, at *2 (holding that "factual dispute in the record as to what occurred on" date employee engaged in the conduct for which her employment was purportedly terminated precluded summary judgment under "but-for" causation standard); *DiCara v. Conn. Rivers Council*, 663 F. Supp. 2d 85, 97 (D. Conn. 2009) (holding under "motivating factor" causation standard that evidence of pretext, "combined with the temporal

proximity of the decision to terminate DiCara's position to his exercise of leave and the delivery of his doctor's note . . . would allow a trier of fact to reasonably conclude that the CRC's explanation is a pretext for retaliation due to DiCara's exercise of rights under the FMLA"). Yellowbook's motion for summary judgment on DeAngelo's FMLA retaliation claim is denied.

## IV.   CONCLUSION

For the reasons stated above, Yellowbook's motion for summary judgment (Doc. 61) is DENIED.

Dated this 27th day of April, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court